**UNITED STATES of America,**
**Plaintiff–Appellee,**

**v.**

**Stephen SARAULT,**
**Defendant–Appellant.**

**No. 86–1197.**

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Oct. 6, 1987.

Decided March 2, 1988.

Cal. J. Potter, III, Lovell, Billbray & Potter, Las Vegas, Nev., for defendant-appellant.

Stanley W. Parry, Sp. Atty., U.S. Dept. of Justice, Las Vegas, Nev., for plaintiff-appellee.

Before FLETCHER, FARRIS and CYNTHIA HOLCOMB HALL, Circuit Judges.

CYNTHIA HOLCOMB HALL, Circuit Judge:

Stephen Sarault appeals from his jury trial conviction of making false statements in a document required to be kept by the Employee Retirement Income Security Act (ERISA), 29 U.S.C. § 1001 et seq., in violation of 18 U.S.C. § 1027, and conspiracy in violation of 18 U.S.C. § 371. We affirm.

## I.

Stephen Sarault is an attorney who practiced primarily business and estate law. He represented Merchant's Bank of Commerce, an off-shore bank his father had established in the West Indies. Sarault was aware this was a "paper" bank: that it was funded with worthless bonds. Michael Strauss, whom Sarault knew had been convicted of fraud and had set up paper banks with Sarault's father, had discussed with Sarault the problems and uses of paper banks. Strauss also referred Sarault to Seymour Pollack, president of American Casualty and Indemnity Corp. (AC & I) so that Sarault might make some money representing AC & I. Soon thereafter, Sarault began to represent AC & I.

Seymour Pollack needed a new asset base for AC & I because the bank he had been using had its telephone disconnected. Pollack entered into an agreement with Anthony Cavanaugh for Cavanaugh to provide Pollack with certificates of deposit

(CDs) drawn on Aiola Bank and Trust, an offshore bank based in the West Indies. In exchange, Cavanaugh would receive ten percent of the insurance premiums written by AC & I. Pollack provided neither cash nor cash equivalent in exchange for the CDs that would provide the "asset" base for AC & I; it was understood the CDs were worthless. Therefore, AC & I was an assetless insurance company.

Soon thereafter, Pollack and Sarault agreed that Sarault would hold in trust six million dollars in these Aiola Bank and Trust CDs as a reserve for any insurance policies written by AC & I. Later, this amount was increased to twenty million dollars. They further agreed that Sarault would provide to anyone who requested verification that he personally held in trust sufficient reserves to back the policies written by AC & I.

Pollack was contacted by an insurance broker, William Kilroy, about the possibility of AC & I underwriting fiduciary liability insurance for the Southern Nevada Culinary and Bartenders Health and Welfare Trust Fund and Pension Trust Fund (hereinafter "Trust Fund" or "Fund"). Kilroy informed Pollack in a letter dated May 12, 1980 that the Fund trustees needed proof of the financial stability of any potential insurance carrier, and that the trustees were going to meet on May 29, 1980 in Las Vegas to discuss fiduciary insurance.[1] Arrangements then were made for Sarault to address the Fund trustees about the stability of AC & I.

Sarault was in Las Vegas on May 28 and May 29. Kilroy tried to meet with Sarault on the 28th to discuss the trustee meeting, and tried to take Sarault to the meeting on the 29th, but on both occasions Sarault was too intoxicated to cooperate. Kilroy attended the trustee meeting alone, and he asked to submit in writing a document that would attest to the stability of AC & I. Kilroy then contacted Pollack and Pollack assured Kilroy that there would be a letter forthcoming from Sarault stating that Sa-

rault held sufficient assets of AC & I to warrant AC & I underwriting the Trust Fund insurance policy.

On June 13, 1980 Kilroy sent a cover letter to counsel for the Trust Fund and enclosed a June 10, 1980 letter from Stephen Sarault to the Fund trustees. The letter was written on letterhead from Sarault's law firm and bore Sarault's signature. In his grand jury testimony, Sarault stated that the signature on the letter was his. However, he claimed he did not remember the letter and believed he did not write it. This letter stated in part:

> This letter is being written at the request of Mr. William Kilroy pursuant to your request for information relating to fiduciary liability insurance coverage for your Health and Welfare Fund as well as your Pension Plan.
>
> Please be advised that I am the general counsel for American Casualty and Indemnity Co., Ltd. and have been requested to advise you as to the reserves currently on deposit that could be set aside as a contingency for your needs.
>
> We currently have reserves in our Trust Account in excess of twenty million ($20,000,000) dollars and, therefore, can assure you that we are prepared to set aside an actuarial reserve for the liability involved.

Actually, Sarault held twenty million dollars in *worthless* CDs. There were no assets to put aside as an actuarial reserve.

This letter was read to the Fund trustees at their June 24 meeting. One of the Fund trustees testified that he had relied on this letter in choosing AC & I as the Fund's fiduciary liability insurance carrier: he believed that AC & I had sufficient assets to back the policy.

On June 30, 1980 Sarault sent a letter to selected businesses and individuals announcing his resignation as counsel for AC & I. He did not send this letter to anyone associated with the Trust Fund. On July 17, 1980 the trustees adopted a resolution

---

1. A copy of this letter was discovered in Sarault's office file. He claimed he did not know how it got there.

to pay AC & I a $126,000 premium for the fiduciary liability policy.

## II.

Sarault contends that his writing the letter to the Trust Fund does not violate 18 U.S.C. § 1027. We review de novo a question of statutory interpretation. *Trustees of Amalgamated Ins. Fund v. Geltman Industries,* 784 F.2d 926, 929 (9th Cir.), *cert. denied,* — U.S. ——, 107 S.Ct. 90, 93 L.Ed.2d 42 (1986).

Title 18 U.S.C. § 1027 (1982) provides in full:

> Whoever, in any document required by title I of the Employee Retirement Income Security Act of 1974 (as amended from time to time) to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals, covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined not more than $10,000, or imprisoned not more than five years, or both.

▬ This statute prohibits *any* knowingly made false statements or representations of fact, as well as *certain* knowingly concealed, covered-up, or undisclosed facts. In order to be within the statutory proscription, a false statement or representation of fact must be made in a document required by ERISA to be either (1) published by an employee welfare benefit plan or employee pension benefit plan, (2) kept as part of the records of such a plan, or (3) certified to the administrator of such a plan.[2] A concealment, cover-up, or failure to disclose likewise must occur in a similar document, but it *also* must relate to a fact

the disclosure of which is required by ERISA or is necessary to verify, explain, or check for accuracy and completeness any information required by ERISA to be published. *See United States v. Martorano,* 596 F.Supp. 621, 624–25 (E.D.Pa.1984), *aff'd,* 767 F.2d 63 (3d Cir.), *cert. denied,* 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985).

At trial, the government argued and offered supporting evidence that Sarault knowingly made a false statement in the letter to the Trust Fund. In reviewing a jury's verdict, we must determine whether a reasonable jury, after viewing the evidence in the light most favorable to the government, could have found Sarault guilty beyond a reasonable doubt of each essential element of the crime charged. *United States v. Douglass,* 780 F.2d 1472, 1475 (9th Cir.1986). After carefully reviewing the record, we conclude that there is sufficient evidence that Sarault knowingly made a false statement in his letter. Because the jury rationally could have concluded that Sarault knowingly made a false statement, we need not determine whether Sarault's statement violated the "concealment" clause of 18 U.S.C. § 1027.

Our next inquiry is whether Sarault's false statement was made in a document that ERISA requires the Trust Fund to keep as part of its records. This is an issue of first impression before this court.

Form 5500, *reprinted in* Pension Reporter Reference File (BNA), 14 Special Supplement No. 1, January 5, 1987, is an annual report form that ERISA requires be published and filed. Among other things, Form 5500 requires disclosure of any premiums paid for fiduciary liability insurance. *Id.,* line 14j(iv). Assets and liabilities of the plan also must be listed. Under normal accounting procedures, prepaid insurance premiums would be listed on an annual report as assets. This was done on the Form 5500 filed in this case in 1986. The amount that the Trust Fund paid for fiduci-

---

**2.** It does not appear that Sarault's letter must be either published or certified to the administrator of the Fund. Thus, the following discussion only refers to documents required to be kept as part of the records.

ary insurance also was included on its Form 5500.

Title 29 U.S.C. § 1027 (1982) describes the records mentioned in 18 U.S.C. § 1027 that must be kept by "[e]very person subject to a requirement to file any description or report ... under this subchapter." Because the Form 5500 annual report is a document that the Fund must file, the following types of records must be retained regarding the information included on a Form 5500:

> [R]ecords on the matters of which disclosure is required which will provide in sufficient detail the necessary basic information and data from which the documents thus required may be verified, explained, or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions.

29 U.S.C. § 1027.

We are aware of only four reported cases that interpret the scope of this record retention provision. The facts of one case are not particularly helpful to our analysis because that case involved falsified information that itself was *required* to be included on Form 5500. *See United States v. Martorano*, 767 F.2d 63, 65–66 (3d Cir.) (false net profits report supplied by medical services provider, which information had to be included on Form 5500, is a document within the purview of 18 U.S.C. § 1027), *cert. denied*, 474 U.S. 949, 106 S.Ct. 348, 88 L.Ed.2d 296 (1985), *aff'g*, 596 F.Supp. 621 (E.D.Pa.1984). The false information provided by Sarault apparently was not required to be reported, nor is there any indication that it was included, on Form 5500.

The other three cases involve documents that share a common thread with Sarault's letters: they all involved (at least in part) nonfinancial information that need not be included on Form 5500, but is helpful to verify and check information that must be included. *See United States v. Bartkus*, 816 F.2d 255, 258 (6th Cir.) (§ 1027 requires

retention of both coordination of insurance benefits form that verified eligibility to receive fund payments and hospital invoice), *cert. denied*, —— U.S. ——, 108 S.Ct. 132, 98 L.Ed.2d 90 (1987); *Combs v. King*, 764 F.2d 818, 824–25 (11th Cir.1985) (§ 1027 provides duty to maintain records of hours worked by employees so trustees can determine accuracy of employer's contributions); *United States v. S & Vee Cartage Co.*, 704 F.2d 914, 917–18 (6th Cir.) (documents misstating number of eligible employees, names of employees covered, and contributions the employer owed were primary source of that information and necessary to verify § 1027 reports), *cert. denied*, 464 U.S. 935, 104 S.Ct. 343, 78 L.Ed.2d 310 (1983).

Sarault claims that because only *financial* records such as receipts and premium statements must be kept under this provision, his letter is not a "required record." Neither a plain reading of the statute, which uses the nonlimiting term "shall include" and mentions nonfinancial records such as resolutions, nor the sparse case law mentioned above, supports his claim.

No regulation has been promulgated to interpret 29 U.S.C. § 1027. However, the predecessor of ERISA, the Welfare and Pension Plan Disclosure Act (WPPDA), 29 U.S.C. §§ 301–09 (1970) (repealed 1974 by ERISA), included a record retention provision whose substantive terms were virtually identical to 29 U.S.C. § 1027.[3] *See* 29 U.S.C. § 308b (1970) (repealed 1974). Two courts that were interpreting the scope of 29 U.S.C. § 1027 relied upon a regulation, 29 C.F.R. § 486 (1984) (removed 1985), that interpreted the predecessor of § 1027, former § 308b. *See S & Vee Cartage*, 704 F.2d at 917–18; *Combs*, 764 F.2d at 824. Title 29 C.F.R. § 486.3 (1984) (removed 1985) provided in part:

> (b) Such records [required to be retained] include (but are not limited to) resolutions and matters relating to the plan for which a description or annual report is or may be required to be filed, journals,

---

**3.** ERISA was enacted to increase the limited protection provided by the disclosure requirements of the WPPDA. *See* H.R.Rep. No. 93–533,

93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4641–43.

ledgers, checks, invoices, bank statements, contracts, agreements, vouchers, worksheets, receipts, claim records and payrolls ... which would *tend to support* information required in any report under the Act.

(Emphasis supplied).

This regulation specifically provided that the records required to be maintained were not limited to those enumerated. *See Combs,* 764 F.2d at 824. The "tend to support information required in any report" language suggests that a broad range of documentation should be maintained under 29 U.S.C. § 1027. While the applicability of the regulation may be questioned because it has been removed, the Sixth Circuit has determined that there is no indication that the enactment of ERISA changed the requirement for the retention of the types of records mentioned in this regulation. *See S & Vee Cartage,* 704 F.2d at 917. The limited legislative history of 29 U.S.C. § 1027 supports this conclusion. One of the forces behind the enactment of ERISA was the need to have more information available to plan beneficiaries so they can enforce their own rights. *See* H.R. Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S.Code Cong. & Admin.News 4639, 4649. Congress intended that "detailed records" be retained. *Id.* at 4659.

The Form 5500 filed by the Trust Fund disclosed that fiduciary liability insurance premiums had been paid. A rational person would interpret this to mean that valuable insurance coverage existed. However, the value of an insurance policy depends on the financial stability of the company that writes the policy. A statement in a letter that a company has twenty million dollars in reserves and will establish an actuarial reserve from that amount indicates that the company can pay claims up to and including the amount of the insurance coverage it provides. But an insurance company that has no assets cannot pay any claims; any coverage it provides is worthless.

If mismanagement of the Trust Fund occurred, the trust corpus would be reduced if the trustees were liable but could not pay the damages for which they were responsible. And if the insurance company that provided fiduciary liability insurance was assetless, it could not replenish the trust corpus. The Fund beneficiaries would have suffered two injuries: losses to the Fund for which the insurance company could not pay, and the expenditure of trust funds on a worthless asset—prepaid fiduciary insurance.

Since disclosure is required on both fiduciary insurance premiums and assets such as prepaid insurance, 29 U.S.C. § 1029 requires that records must be kept in order to verify, explain, clarify, and check for accuracy and completeness this information reported on Form 5500. The letter Sarault sent is such a record. It can be used to verify or explain the value of the insurance coverage purchased and the value of the assets represented by the prepaid premiums. It could alert beneficiaries to mismanagement or foolish expenditures of trust funds. *Cf.* H.R.Rep. No. 533, 93d Cong., 2d Sess., *reprinted in* 1974 U.S. Code Cong. & Admin.News 4639, 4649. Subjecting Sarault to the reach of 18 U.S.C. § 1027 would promote the goals of ERISA: if fiduciary insurance providers and their agents are not sanctioned for providing false statements about worthless fiduciary insurance, plan participants may suffer. *Cf. Martorano,* 767 F.2d at 65.

The legislative history of the WPPDA notes this reason for its enactment: "[N]umerous instances of abuses and deficiencies have been uncovered which drain off countless millions of dollars from their intended purposes and in other ways deprive the employee beneficiaries of these plans of what rightfully belongs to them." Specifically, the following insurance practices were known to exist:

[I]nstances of exorbitantly high commissions, fictitious and excessive administrative fees, retention by insurance companies of unduly large shares of the premiums, ... computing commissions on separate coverages or types of benefits within the same plan, placing the interests of the policyholder before that of the beneficiaries ... premium embezzle-

ments by insurance brokers and agents ... and collusion between insurance representatives.

S.Rep. No. 1440, 85th Cong., 2d Sess., *reprinted in* 1958 U.S.Code Cong. & Admin. News 4137, 4146.

Since ERISA was enacted to broaden the protection provided by the WPPDA,[4] Congress must have intended to continue to prevent these types of abuses. The sale of worthless insurance in this case is just another form of these deceptive insurance practices.

Furthermore, the accountant who prepared the Form 5500 for the Trust Fund testified that the information that Sarault provided in his letter about the assets of AC & I is the type of information that can be used to verify, explain, or clarify a Form 5500. Had he known the information in the letter was false, he would have altered the way he prepared the Form 5500. Sarault challenges this testimony as conjectural, but the value of the testimony is not to prove the accountant would have relied on Sarault's letter if he had it.[5] These statements are indicative of the value of the letter as a record.

We hold that Sarault's letter to the Trust Fund is a document that ERISA requires the Fund to retain as a record; therefore, Sarault's false statement in the letter violated 18 U.S.C. § 1027.

### III.

■ Sarault contends that the district court erred in allowing evidence of his involvement in another fraudulent scheme involving off-shore financing, the Baker transaction. We review a district court's decision to admit evidence of prior bad acts under Fed.R.Evid. 404(b) for an abuse of discretion. *United States v. Feldman,* 788 F.2d 544, 557 (9th Cir.1986) (court has wide discretion), *cert. denied,* —— U.S. ——, 107 S.Ct. 955, 93 L.Ed.2d 1003 (1987).

■ Evidence of prior acts is not admissible to show bad character, but is admissible to prove intent, knowledge, or lack of mistake if the following prerequisites are met: (1) The prior conduct must be admitted to prove an element of the charged offense that is a material issue; (2) in some cases the prior conduct must be similar to the offense charged; (3) clear and convincing proof that the defendant committed the prior act must be produced; (4) the probative value must not be substantially outweighed by the danger of unfair prejudice; and (5) the prior act must not be too remote in time from the commission of the crime charged.[6] *See United States v. Alfonso,* 759 F.2d 728, 739 & n. 7 (9th Cir.1985); *United States v. Bailleaux,* 685 F.2d 1105, 1109–10 (9th Cir.1982).

Sarault claims that the Baker transaction was not relevant to any material issue in the trial. The Government introduced the prior act evidence primarily to show Sarault's knowledge and intent regarding both the conspiracy and the false statements in the letter sent to the trustees. These were essential elements of the crimes charged. The district court did not abuse its discretion in admitting the prior act evidence for this purpose.

As a related issue, Sarault claims he never raised the issues of knowledge and intent but only left the Government to its proof of all the elements. Therefore, Sarault contends that the only need for the prior act evidence was of the Government's own making and was avoidable. According to this argument, the Government was attempting to bring Sarault's character into issue in its case-in-chief.

Sarault's argument fails for two reasons. First, under the law of this circuit, although the prosecution normally may not attack a defendant's character, "evidence of past crimes, is admissible, as an exception to this rule, where 'the evidence has

---

**4.** *See supra* note 3.

**5.** Sarault claims that because the accountant did not actually rely on his letter the criminality of his act is affected. But 18 U.S.C. § 1027 prohibits false statements. Nothing in its language

suggests reliance is needed. *See Martorano,* 596 F.Supp. at 626.

**6.** Sarault does not challenge the existence of this last prerequisite.

probative force relevant to intent or motive, design, knowledge, identity, or habits....'" *United States v. Martin*, 489 F.2d 674, 676 (9th Cir.1973) (quoting *Smith v. Rhay*, 419 F.2d 160, 164 (9th Cir.1969)), *cert. denied*, 417 U.S. 948, 94 S.Ct. 3078, 41 L.Ed.2d 668 (1974). Second, in his testimony to the grand jury Sarault stated he did not know either that AC & I was assetless or that AC & I was being used fraudulently. This statement put the Government on notice that Sarault would likely raise lack of knowledge or intent as a defense to the conspiracy and false statement charges. We recognized in *United States v. Hooton*, 662 F.2d 628, 635 (9th Cir.1981), *cert. denied*, 455 U.S. 1004, 102 S.Ct. 1640, 71 L.Ed.2d 873 (1982), that "even in general intent crimes, the government can offer evidence of other acts as part of its case-in-chief when it is obvious that the defense will raise lack of intent as a defense." Thus, it is irrelevant that the Government introduced the prior acts to prove intent and knowledge before Sarault raised lack of intent and knowledge as a defense.

■ Sarault also claims that evidence of the Baker transaction was not sufficiently similar to the Trust Fund transaction to make it relevant to the present case.

In the Baker transaction, Sarault represented both AC & I and Merchant's Bank. This transaction involved an advance fee scheme: fees would be obtained from people who needed loans without the intent to ever actually provide the loans. AC & I and Merchant's Bank were going to be co-guarantors of either a construction bond or a letter of credit in favor of Rex Baker so that Baker could obtain financing for his construction company. Sarault's involvement in the Baker transaction is not completely described in the record. However, the record does show that Sarault had discussed with Pollack AC & I's proposed guarantee of the Baker transaction. Furthermore, as part of this scheme, Sarault sent a telex to a loan brokerage company in which he stated that he would confirm that he held "eight-figure reserves" on behalf

of AC & I. He also stated that another party would confirm that Merchant's Bank had "eight-figure reserves." But neither AC & I nor Merchant's Bank had any real assets, and Sarault admits he knew this fact about Merchant's Bank. Thus, any guarantee that either company made was worthless.[7]

The Baker transaction is not identical to the Trust Fund transaction, but it is similar enough for Rule 404(b) purposes. Both fraudulent transactions occurred during the same time period. Both transactions involved dealings with Pollack and AC & I. The basis for each scheme was the creation of an assetless offshore bank used to underwrite legitimate business transactions. In both instances Sarault was involved in schemes to take people's money and provide them with something worthless. In the Baker transaction, this was a worthless guarantee. In the Trust Fund transaction, it was worthless insurance. In both instances Sarault worked as counsel for AC & I and was supposed to confirm that AC & I actually had assets. But in both cases AC & I actually was assetless.

Sarault claims that evidence of the Baker transaction is not clear and convincing. However, evidence of Sarault's involvement is strong, clear, and damning; whether it is convincing was for the jury. *See United States v. Moore*, 580 F.2d 360, 364 (9th Cir.), *cert. denied*, 439 U.S. 970, 99 S.Ct. 463, 58 L.Ed.2d 430 (1978).

Sarault contends that the district court abused its discretion because it "mechanically" balanced probative value and unfair prejudice. However, the record reveals that the district court considered both the probative value and the prejudice of the evidence, ruled that the prior act evidence would not be allowed to prove any element of the conspiracy until there was evidence the defendant participated in it, and instructed the jury on the limited use of the evidence. Because this shows a considered awareness of the potential prejudice, the court did not abuse its discretion. *See*

---

7. Sarault was convicted of crimes involving some aspect of the Baker transaction, but it is not clear from the record what those crimes were.

*United States v. Morris,* 827 F.2d 1348, 1350 (9th Cir.1987).

### IV.

■ Sarault was charged with conspiring to falsely represent to Fund trustees that AC & I had sufficient assets to satisfy claims made against the fiduciary liability insurance that AC & I sold. Sarault claims that there was insufficient evidence from which a jury could find him guilty of conspiracy; therefore the district court erred in not granting his motion for acquittal.

We review the denial of a motion for judgment of acquittal pursuant to Fed.R. Crim.Pro. 29 to determine whether, viewing the evidence in the light most favorable to the Government, there was substantial relevant evidence produced from which the jury reasonably could have found the defendant guilty beyond a reasonable doubt. *United States v. Talbert,* 710 F.2d 528, 530 (9th Cir.1983), *cert. denied,* 464 U.S. 1052, 104 S.Ct. 733, 79 L.Ed.2d 192 (1984). After carefully reviewing the entire record, we hold that there was sufficient evidence to sustain a conviction.

■ Sarault claimed at trial that he withdrew from the conspiracy when he sent his resignation letter. He argues on appeal that the failure of the Government to rebut this claim of withdrawal mandated an entry of acquittal.

■ In order to avoid complicity in the conspiracy, one must withdraw before any overt act is taken in furtherance of the agreement. *United States v. Loya,* 807 F.2d 1483, 1493 (9th Cir.1987). There is sufficient evidence in this case to find that at least one overt act was taken to carry out the plans of the conspiracy. (E.g., the trip to Las Vegas where the trustee meeting was being held, the letter from Sarault to the Fund.) Contrary to Sarault's contentions, the overt act need only be a concrete step toward carrying out the agreement, not one that actually accomplishes the goal of the conspiracy. *See United States v. Washington Water Power Co.,* 793 F.2d 1079, 1082 n. 3 (9th Cir.1986).

Sarault could not withdraw from the conspiracy by sending his resignation letter because he already had performed overt acts. The Government did not need to rebut Sarault's claim of withdrawal because withdrawal could not occur. Therefore, the failure to grant Sarault's motion for acquittal was not erroneous.

### V.

Sarault contends that the Government violated his Due Process rights for two reasons: (1) the Government did not reveal to Sarault that it was introducing a photocopy into evidence, and (2) the Government knew before and during trial what Sarault now theorizes: that the photocopy was a "cut and paste" forgery. Nothing in the record supports either claim.

### VI.

For these reasons, the decision of the district court is AFFIRMED.