962 F.2d 16
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Yvonne WILSON, J.F. Spann, Sam Merit, and Oded Benary,
Defendants-Appellants.
 Nos. 91-10047 thru 91-10050.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted March 11, 1992.
Decided April 23, 1992.
 
 1
 Before CHOY, FARRIS and RYMER, Circuit Judges
 
 
 2
 MEMORANDUM*
 
 
 3
 Yvonne Wilson, Sam Merit, Oded Benary, Eldon Bollinger, Tom Leding, and J.F. Spann were indicted on one count of wire fraud (18 U.S.C. § 1343), ten counts of interstate transportation of a victim of fraud (18 U.S.C. § 2314), one count of fraud in the sale of securities (15 U.S.C. § 77q), one count of sale of unregistered securities (15 U.S.C. § 77e), and one count of conspiracy to commit offenses against the United States (18 U.S.C. § 371). Wilson, Merit, Benary, and Spann appeal from their convictions on various counts. We affirm.
 
 I. Merit's Extradition
 
 4
 Merit argues that the district court lacked in personam jurisdiction because his extradition from the Republic of South Africa violated this country's treaty of extradition with the Republic and also violated the principles of dual criminality and speciality. Merit's extradition and subsequent prosecution were valid and lawful, as we hold in a separate opinion.
 
 
 5
 II. The Prior Convictions of Merit and Benary
 
 
 6
 Spann and Benary argue that they were denied a fair trial when the district court allowed the government to introduce evidence of prior convictions of Merit and Benary. In a related argument, Merit claims that (1) the district court erred by denying his motion to dismiss the indictment because the government erroneously informed the grand jury that the prior convictions were felonies, and (2) the government was collaterally estopped from claiming that the priors were felonies because the district court in Merit's Texas prosecution had ruled that the priors were misdemeanors.
 
 
 7
 Count 1 of the indictment charges that in order "[t]o further induce investors to invest in Tracon, the defendants did knowingly omit to state material facts including ... [t]hat defendants Merit and Benary had each been convicted of a felony in 1980 in U.S. District Court." Benary and Merit had been convicted in the District of New Jersey in 1980 for violations of the Elkins Act, 49 U.S.C. § 41. The Elkins Act, repealed in 1978, classified a violation as a misdemeanor despite the fact that it carried a maximum sentence of two years.
 
 
 8
 Contrary to Spann's argument, Fed.R.Evid. 609 does not bar evidence of the priors because the government did not introduce the evidence in order to impeach the defendants. Even if it had, evidence of the priors was admissible under Rule 609 whether or not they were felonies. Rule 609(a)(1) allows impeachment by evidence of a prior conviction "if the crime was punishable by ... imprisonment in excess of one year...." Rule 609(a)(2) allows such impeachment if the crime "involved dishonesty or false statement, regardless of the punishment." Because a violation of the Elkins Act carried a two-year maximum sentence, the evidence was admissible under Rule 609(a)(1), and because the prior convictions involved dishonesty, the evidence also was admissible under Rule 609(a)(2).
 
 
 9
 Nor was evidence of the Elkins Act convictions inadmissible under Rules 403 and 404. The government did not introduce this evidence to prove character, but to prove its theory that the priors were material facts that should have been disclosed to potential investors; as such, the evidence was relevant and not unduly prejudicial. Cf. Breard v. Sachnoff & Weaver, Ltd., 941 F.2d 142, 144 (2d Cir.1991) (failure to disclose prior fraud conviction in offering memorandum "could be considered reckless as a matter of law" in private action under § 10(b) of Securities Exchange Act of 1934).
 
 
 10
 Merit concedes that we are precluded by United States v. Mechanik, 475 U.S. 66, 70 (1986) (supervening conviction renders dismissal of indictment for grand jury irregularities "inappropriate"), from reviewing most of the grounds for his pretrial motion to dismiss the indictment, but claims that prosecutorial misconduct in using the word "felony" still requires dismissal of the indictment because it had an improper effect on the grand jury's decision to indict. See Bank of Nova Scotia v. United States, 487 U.S. 250, 254, 257 (1988) (Where an error has not "so compromised" "the structural protections of the grand jury ... as to render the proceedings fundamentally unfair," the "district court may not dismiss an indictment for errors in grand jury proceedings unless such errors prejudiced the defendants.").
 
 
 11
 There is no indication that use of the word "felony" in the indictment substantially influenced the decision to indict. Even if the priors were misdemeanors, and even if the grand jurors had been told that the priors were misdemeanors, there is no reason to believe that the grand jury would not have returned the indictment against Merit and his codefendants. Failing to tell investors about the priors was not material because the priors were felonies (as opposed to misdemeanors), but because they were offenses involving dishonesty. The grand jury therefore had probable cause to believe the defendants guilty whether or not the priors were properly classified as felonies.
 
 
 12
 Merit also argues that an earlier ruling of the district court for the Northern District of Texas that the priors were misdemeanors collaterally estopped the government from charging that he and Benary were convicted of a felony. That ruling does not pass muster under the three-part collateral estoppel test of United States v. Bernhardt, 840 F.2d 1441, 1448 (9th Cir.), cert. denied, 488 U.S. 954 (1988).
 
 
 13
 Because the question whether the priors were misdemeanors or felonies is not a question of "ultimate fact," Ashe v. Swenson, 397 U.S. 436, 443 (1970); Bernhardt, 840 F.2d at 1448, it is not "necessary" to the final judgment. Nor was Judge Mahoney's ruling subject to meaningful appellate review.[1] That "strongly militates against" giving the ruling preclusive effect. Standefer v. United States, 447 U.S. 10, 23 & n. 18 (1980) ("The estoppel doctrine ... is premised upon an underlying confidence that the result achieved in the initial litigation was substantially correct. In the absence of appellate review, or of similar procedures, such confidence is often unwarranted."). The district court did not abuse its discretion in declining to apply the doctrine.
 
 III. Evidentiary Rulings
 A. Admission of Exhibits 35 & 36
 
 14
 Wilson claims that the district court erred by admitting Exhibits 35-36, which were photocopies of Trans World Airlines (TWA) billing statements reflecting the shipment of "printed material" from Securities Transfer, Inc., Tracon's transfer agent in Florida, to Merit in Arizona. Wilson argues that the exhibits were inadmissible as records of regularly conducted business activity under Fed.R.Evid. 803(6) because the government's witness, a TWA employee, could not accurately testify as to the custody, control, and copying of the documents.
 
 
 15
 The government introduced this evidence to prove that stock certificates had been shipped in interstate commerce as alleged in counts 12 and 13. The billing statements showed that "printed material" had been shipped to Merit. Although the TWA employee testified that he had not been designated the custodian of records by TWA and had not compared the originals to the copies, he recognized the documents as being of the type regularly used in his work at TWA, and testified that he had completed one of the two forms himself in 1985. The district court was within its discretion in finding that the TWA employee was a qualified witness under Rule 803(6). United States v. Ray, 930 F.2d 1368, 1370 (9th Cir.1990).
 
 
 16
 B. Hearsay Testimony Regarding Assay Reports
 
 
 17
 Wilson claims that the court erred by allowing the testimony of Wallace Myers, who had prepared two assays which indicated that the Arizona mining site had only "trace, negligible, or no valuable" mineral resources. Myers testified that he had received a call from an unknown potential investor who read him a version of Myer's report that contained far more favorable results than Myers had found. During closing arguments, the government used this testimony to imply that the defendants had falsified the report. Because Wilson did not make a timely objection to the challenged testimony,[2] we employ a plain error standard of review. United States v. Gomez-Gallardo, 915 F.2d 553, 555 (9th Cir.1990).
 
 
 18
 Even if the testimony was hearsay, receiving it was not plain error. Myers was only one among dozens of witnesses in this case, and his remarks about the statements of the unknown caller comprised but a small part of his testimony. In addition, the testimony prompted only a passing reference to the unknown caller in the government's closing argument. Cf. id. at 555 ("[I]n the absence of timely objection, only those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings will be corrected by this court.") (quoting United States v. Smith, 790 F.2d 789, 793 (9th Cir.1986)).
 
 C. Cross-Examination of Herndon
 
 19
 Wilson argues that the district court erred by allowing the government to cross-examine her character witness, Gwen Herndon, based on facts not in the record. After testifying about Wilson's character, the government asked Herndon on cross-examination:
 
 
 20
 Were you aware that Ms. Wilson, as president of Tracon, and J.F. Spann, wrote checks to cash from a corporate account in the amount of $158,000?
 
 
 21
 The defense objected to the question as being "outside of the evidence," and asked for a mistrial. The court's denial of the motion was appropriate. An FBI summary witness testified that he traced "checks payable to Cash endorsed by some or all" of the defendants, as well as checks payable directly to the defendants. He also testified that roughly $158,000 was paid out to the defendants, accounts controlled by the defendants, or companies that the defendants controlled or attempted to control. The question therefore did not assume facts not in evidence.
 
 D. Cross-Examination of Skinner
 
 22
 Spann argues that the district court erred by restricting his cross-examination of Gordon Todd Skinner in violation of his rights under the Confrontation Clause of the Sixth Amendment. See United States v. Bonanno, 852 F.2d 434, 439 (9th Cir.1988), cert. denied, 488 U.S. 1016 (1989).
 
 
 23
 Count 1 of the indictment (wire fraud) alleged that Merit, while in Arizona, placed a call to Skinner in Oklahoma on June 4, 1984, for the purpose of executing the scheme to defraud. Spann claims that the credibility of Skinner, who was under state indictment in New Jersey for a drug offense, became a "critical issue in the trial." Skinner, who refused to answer any questions that he felt implicated the ongoing criminal proceedings in New Jersey, invoked his Fifth Amendment privilege numerous times. Spann claims that Skinner's silence on these issues prevented him from exploring Skinner's bias and motivation to assist the government.
 
 
 24
 To the extent Spann implies that his Sixth Amendment rights must trump Skinner's Fifth Amendment rights, he is incorrect. The Supreme Court has never construed the Sixth Amendment to mean "that no witness on cross-examination could ever constitutionally assert a testimonial privilege, including the privilege against compulsory self-incrimination guaranteed by the Constitution itself." McCray v. Illinois, 386 U.S. 300, 314 (1967).
 
 
 25
 The jury had sufficient information with which to evaluate Skinner's credibility and bias. See Bonanno, 852 F.2d at 439. On direct examination, Skinner testified that he had been arrested and charged in Boston in 1987 with possession of marijuana with intent to distribute, which charges were later dropped. He also testified that he had been arrested in New Jersey in 1989 for a drug offense, that he had been charged under New Jersey's drug kingpin statute, that the trial was pending, and that the offense carried a sentence of twenty-five years to life. Further, he testified that he was cooperating with the government in an ongoing criminal investigation in order to gain "some sort of a favorable input to my problems in New Jersey," but that his cooperation in that unrelated investigation had nothing to do with his testimony in this case.
 
 
 26
 On cross-examination, Skinner testified extensively about his cooperation with federal authorities on several occasions, and the benefits he had obtained and hoped to obtain in exchange for that cooperation. Although the court did not allow defense counsel to explore whether Skinner's cooperation was connected in any way to his step-father and placed several other limitations on the cross-examination, defense counsel had ample opportunity to establish bias and motive. The district court therefore did not abuse its discretion in allowing Skinner to invoke his privilege against self-incrimination and otherwise limiting Skinner's cross-examination.
 
 
 27
 E. Failure to Give Limiting Instructions Upon Mention of "the RICO Action" and the SEC Injunction
 
 
 28
 Benary argues that the district court erred in denying his motions for mistrial and for a limiting instruction when a witness testified that Merit and Benary had been involved in a RICO lawsuit. Benary also claims that he was denied a fair trial when a government witness was allowed to read the text of an SEC injunction that had been entered against Merit and his associates.
 
 
 29
 On redirect examination, a government witness testified that Merit, Benary, and Tracon had been defendants in "a RICO action" arising out of Tracon's attempted purchase of Coral Air, a commuter airline in the Virgin Islands. The court did not abuse its discretion, because the defense opened the door by asking the government witness about certain activities in connection with the RICO action. Assuming that a limiting instruction was requested, it was within the court's discretion to decline to give one. It is doubtful that a jury of laypersons would even know what "RICO" means; in any event, the testimony was not so extensive or inflammatory that the jury would likely have labeled Benary a "racketeer." Moreover, in its general charge to the jury, the court instructed the jury that "[t]he defendants are not on trial for any conduct or offense no[t] charged in the indictment." Cf. United States v. Soliman, 813 F.2d 277, 279 (9th Cir.1987) (nearly identical instruction sufficient to warrant conclusion that court did not abuse discretion in failing to give limiting instruction concerning "other crimes" evidence). Finally, in light of the overwhelming evidence against the defendants, it is more probable than not that any impermissible inference drawn by the jury did not materially affect the verdict. Cf. United States v. Guerrero, 756 F.2d 1342, 1347 (9th Cir.), cert. denied, 469 U.S. 934 (1984).
 
 
 30
 Benary also complains about the district court's failure to give a limiting instruction when a government witness read the SEC injunction. Having failed to ask for one, however, he "waived the request." United States v. Jenkins, 785 F.2d 1387, 1396 (9th Cir.), cert. denied, 479 U.S. 855, 889 (1986). There was no plain error.
 
 F. Merit's Threat to a Witness
 
 31
 Benary argues that he was denied a fair trial when the court allowed a government witness to testify about a threat Merit had made without giving a limiting instruction as to the admissibility against Benary of Merit's threat. Kolleen Kubik, office manager of Securities Transfer in Florida, testified that Merit, in the course of demanding the return of certain Tracon records, said to her, "I'm going to take care of you, little girl." Because Benary did not request a limiting instruction, he waived his request. No plain error appears in the testimony of Kubik, who only related Merit's words without attempting to characterize them as a threat.
 
 IV. Sufficiency of the Evidence
 A. Wilson
 
 32
 Wilson contends that the evidence was insufficient to support her convictions on all fourteen counts. Wilson, who served as president of Tracon at one point and claims that her "primary involvement was with the operation of the mine," argues that there is "no evidence that any of [the money] reached her pocket," that she was aware of the false statements made by her codefendants regarding Tracon stock, that she played a part in the sale of Tracon stock, or that she caused or induced the investors to travel to Arizona.
 
 
 33
 "Once the existence of the conspiracy is shown ... the government need only prove a 'slight' connection between the defendant and the conspiracy." United States v. Baron, 860 F.2d 911, 919 (9th Cir.1988), cert. denied, 490 U.S. 1040 (1989). Moreover, "[s]uch connection to a conspiracy may be inferred from circumstantial evidence." United States v. Mares, 940 F.2d 455, 458 (9th Cir.1991). Once the defendant's connection to the conspiracy is established, she is responsible for any "foreseeable substantive offenses committed in furtherance of the conspiracy." United States v. Aichele, 941 F.2d 761, 764 (9th Cir.1991) (citing Pinkerton v. United States, 328 U.S. 640, 646-47 (1946)).
 
 
 34
 In this case, Wilson's connection to the conspiracy was more than "slight." The testimony of Mowry, Bowman, Giza, Haberman, and Myers shows that Wilson was intimately connected with numerous aspects of the company, was warned to discontinue misrepresenting the productivity of the mine, and even confessed to buying gold and silver that she had previously claimed was from the mine. It cannot be said that no rational jury could have found Wilson's connection to the conspiracy beyond a reasonable doubt. Her sufficiency arguments therefore fail.
 
 
 35
 Wilson also contends that the evidence was insufficient to prove that the TWA shipments from Florida to Arizona contained stock certificates. The evidence shows that the TWA shipments were sent by Tracon's stock transfer agent and bore labels indicating that the contents were "printed material." This circumstantial evidence is sufficient for a rational jury to conclude beyond a reasonable doubt that the shipments contained stock certificates.
 
 B. Merit
 
 36
 Merit timely moved for a Fed.R.Crim.P. 29 judgment of acquittal on the ground that the call to Skinner on June 4, 1984, was not in furtherance of or in execution of the scheme to defraud. He argues that the motion should have been granted because the call "did not involve the sale of unregistered stock," but instead involved "a possible loan of money from Skinner to Tracon in return for a promissory note secured by specific parcels of real estate."
 
 
 37
 To support a conviction under 18 U.S.C. § 1343, the call "need not be an essential part of the contemplated scheme, [but] need only be made for the purpose of executing the scheme." United States v. Garner, 663 F.2d 834, 838 (9th Cir.1981), cert. denied, 456 U.S. 905 (1982). The transcript of the call shows that Merit and Skinner discussed the mining equipment at the Arizona site, the production start-up date, a brochure Skinner was preparing to promote the Tracon mine to potential investors, and Skinner's anticipated visit to the mine site. The discussion was "for the purpose of executing [the] scheme" to defraud. 18 U.S.C. § 1343. Even if Merit and Skinner had only discussed the loan desired by Merit, as Merit claims, to the extent that Merit sought the loan to keep Tracon afloat, the call was "for the purpose of executing [the] scheme" to defraud. See United States v. Cusino, 694 F.2d 185, 187 (9th Cir.1982) ("Usefulness [of the wire transmissions] to the perpetrator is sufficient under section 1343."), cert. denied, 461 U.S. 932 (1983). Accordingly, "there was substantial relevant evidence produced from which the jury reasonably could have found the defendant guilty beyond a reasonable doubt." United States v. Sarault, 840 F.2d 1479, 1487 (9th Cir.1988).
 
 
 38
 Merit next challenges the sufficiency of the evidence under counts 1 and 14. He argues that because his prior Elkins Act conviction and SEC injunction were public, "non-corporate" information, his failure to disclose them to investors could not constitute fraudulent conduct under the wire fraud statute in the absence of a duty to disclose, and could not support his conviction for conspiracy under count 14.
 
 
 39
 The scheme to defraud, however, involved both affirmative misrepresentations and material omissions. Many of the victims of the scheme testified that they were induced to invest in Tracon by the defendants' misrepresentations regarding the mine's potential and past production, Merit's past business activities, and the ownership of the mining equipment.[3]
 
 
 40
 Although in this circuit "a non-disclosure can only serve as a basis for a fraudulent scheme when there exists an independent duty that has been breached by the person so charged," United States v. Dowling, 739 F.2d 1445, 1449 (9th Cir.1984), rev'd on other grounds, 473 U.S. 207 (1985), the government's case did not rest solely on the alleged omissions. Evidence of affirmative misrepresentations sufficiently established the requisite scheme to defraud under the wire fraud statute. See United States v. Benny, 786 F.2d 1410, 1418 (9th Cir.) ("Proof of an affirmative, material misrepresentation supports a conviction of mail fraud without any additional proof of a fiduciary duty."), cert. denied, 479 U.S. 1017 (1986); cf. United States v. Biesiadecki, 933 F.2d 539, 542-43 (7th Cir.1991) (district court did not abuse its discretion in admitting evidence of omissions where there was also "abundant evidence" of affirmative misrepresentations). Therefore, it is unnecessary for us to decide whether Merit and his codefendants owed an independent duty to the potential investors in this case.
 
 C. Benary
 
 41
 Benary contends that the government failed to carry its burden of proving that Tracon stock was not exempt from registration and that his conviction under count 13 (interstate sale of unregistered securities in violation of 15 U.S.C. § 77e) was therefore improper. It is Benary, however, who bears the burden of proof on this issue. See SEC v. Murphy, 626 F.2d 633, 641 (9th Cir.1980) (citing SEC v. Ralston Purina Co., 346 U.S. 119, 126 (1953)). Even if the government did bear the burden of proof, there was ample evidence from which a rational jury could conclude that it was carried,[4] and no evidence that the stock in question was exempt from SEC registration requirements. Therefore, it is immaterial that the district court instructed the jury that the government bore the burden; it is also immaterial whether, as Benary argues, the government "elected ... to bear the burden of proof" by charging in count 1 of the indictment that the defendants failed to disclose that "the stock of Tracon was neither registered nor exempt from registration as required by federal securities laws."
 
 V. The Denial of Benary's Severance Motion
 
 42
 Benary contends that the district court denied him a fair trial when it refused to grant his request for severance.
 
 
 43
 "When the reason for severance is the need for a codefendant's testimony, defendant must show that he would call the codefendant at a severed trial, that the codefendant would in fact testify, and that the testimony would be favorable to the moving party." Jenkins, 785 F.2d at 1393. The district court did not abuse its discretion in concluding that Merit, who had vacillated several times and expressed great concern that his testimony could ultimately be used against him, was making a conditional offer to testify. See United States v. Mariscal, 939 F.2d 884, 886 (9th Cir.1991). In addition, there was "other inculpatory evidence that in and of itself would be sufficient to support a conviction," id., which would have been heard by both juries. Benary therefore cannot show " 'clear,' 'manifest,' or 'undue' prejudice from a joint trial that violates a substantive right." United States v. Candoli, 870 F.2d 496, 510 (9th Cir.1989).
 
 
 44
 VI. The Jury Instructions on Counts 13 and 14
 
 
 45
 Benary challenges the jury instructions on counts 13 and 14, but because he did not do so at trial, we review only for plain error. United States v. Kessi, 868 F.2d 1097, 1102 (9th Cir.1989).
 
 
 46
 Benary takes issue with the instruction that "[k]nowledge that the stock was unregistered may be found from circumstances that would convince an average ordinary person." Viewed as a whole, however, the jury instructions do not " 'water[ ] down' the Government's burden of persuasion on the element of knowledge." United States v. Eaglin, 571 F.2d 1069, 1074 (9th Cir.1977), cert. denied, 435 U.S. 906 (1978). The court gave the jury "a proper 'deliberate ignorance' instruction," id., as well as instructions focusing on intentional conduct. The court's "ordinary person" instruction does not require reversal. See United States v. Bordallo, 857 F.2d 519, 527 (9th Cir.1988) (" '[A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge.' ") (quoting United States v. Park, 421 U.S. 658, 674 (1975)), amended on other grounds, 872 F.2d 334 (9th Cir.), cert. denied, 493 U.S. 818 (1989).
 
 
 47
 Benary also challenges the absence of a specific unanimity instruction. A specific unanimity instruction is sometimes required where " 'there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts....' However, in the ordinary case, a general instruction that the verdict must be unanimous will be sufficient to protect the defendant's rights." United States v. Anguiano, 873 F.2d 1314, 1319 (9th Cir.) (quoting United States v. Echeverry, 719 F.2d 974, 975 (9th Cir.1983)), cert. denied, 493 U.S. 969 (1989). In this case, the court not only gave such a general unanimity instruction, but instructed the jury that it "must find that there was a plan to commit at least one of the crimes alleged in the indictment as an object of the conspiracy." The indictment was not sufficiently ambiguous or the case sufficiently complex to warrant a specific unanimity instruction and the failure to give one was not plain error.
 
 VII. Benary's Immunized Grand Jury Testimony
 
 48
 Benary argues that the district court erred in failing to hold an evidentiary hearing on his motion for a new trial based on his immunized grand jury testimony. The decision whether to grant a motion for a new trial pursuant to Fed.R.Crim.P. 33 is reviewed for abuse of discretion. United States v. Lopez, 803 F.2d 969, 977 (9th Cir.1986), cert. denied, 481 U.S. 1030 (1987). "[T]he district court's finding that the government's evidence was untainted by a grant of immunity" is reviewed for clear error. United States v. Lipkis, 770 F.2d 1447, 1450 (9th Cir.1985).
 
 
 49
 In 1982, Benary, under a grant of judicial immunity pursuant to 18 U.S.C. § 6002, appeared before a grand jury in the Eastern District of New York investigating former Secretary of Labor Raymond Donovan. On the morning of sentencing in this case, Benary filed a supplemental and expanded motion for new trial claiming that "it is entirely possible, if not probable, that [the immunized testimony] has been used to formulate the basis of the prosecution of the instant case in violation of the immunity order." Attached to the motion were two affidavits, one by Benary and one by Anthony Gallagher, who appeared before the New York grand jury with Benary. The district court faulted Benary's failure to raise the issue earlier and found no material connection between Gallagher's affidavit and the matters raised at trial.
 
 
 50
 Benary claims that the district court should have unsealed his immunized testimony and conducted an in camera inspection to determine "whether the Government utilized the fruits of Benary's immunized testimony as a nexus in gathering the evidence to investigate and subsequently prosecute him." He relies on Kastigar v. United States, 406 U.S. 441, 461-62 (1972). Yet Kastigar itself holds that "immunity from use and derivative use [under 18 U.S.C. § 6002] is coextensive with the scope of the privilege against self-incrimination." Id. at 453. "In general, the privilege against self-incrimination only prohibits compelled testimony that might incriminate a witness for crimes he had already committed, or was in the process of committing, at the time the testimony was given." United States v. Harvey, 869 F.2d 1439, 1446 (11th Cir.1989) (en banc). Although the Fifth Amendment privilege is not entirely inapplicable to prospective acts, Marchetti v. United States, 390 U.S. 39 (1968), the person seeking to invoke the privilege must show "substantial and 'real,' and not merely trifling or imaginary, hazards of incrimination" for future conduct. Id. at 53. Such a showing is "rarely" made. Harvey, 869 F.2d at 1447-48; see also United States v. Freed, 401 U.S. 601, 606-07 (1971) (refusing to give Self-Incrimination Clause interpretation "which protects a person against incrimination not only against past or present transgressions but which supplies insulation for a career of crime about to be launched").
 
 
 51
 Benary's activities in connection with Tracon began after he testified before the New York grand jury.[5] He fails to suggest how he could have invoked the Fifth Amendment before the grand jury on the basis of a "substantial and 'real' " risk, Marchetti, 390 U.S. at 53, that his testimony would incriminate his actions in connection with a company of which he had no knowledge at the time. Because he could not invoke the Fifth Amendment before the 1982 New York grand jury with respect to his future Tracon activities, his 1982 immunity, which is coextensive with his Fifth Amendment rights, cannot protect him from his subsequent prosecution for these activities. See United States v. Harvey, 900 F.2d 1253, 1258 (8th Cir.1990) ("[A]ny transactional immunity Harvey received in 1980 is irrelevant to a prosecution for a tax conspiracy that began in 1982."), cert. denied, 111 S.Ct. 754 (1991); United States v. Seltzer, 794 F.2d 1114, 1120 (6th Cir.1986), cert. denied, 479 U.S. 1054 (1987). Accordingly, the district court correctly denied Benary's motion for a new trial without holding a Kastigar hearing.
 
 
 52
 VIII. Double Jeopardy--Merit's Prior Conviction for Contempt of Court
 
 
 53
 Merit contends that his rights under the Double Jeopardy Clause were violated because an earlier conviction for contempt of court covered the same conduct alleged in the wire fraud and conspiracy counts for which he was convicted. Merit argues that because the scheme to defraud alleged in counts 1 and 14 involved the abuse of interairline travel privileges, as did the contempt proceeding, he has twice been placed in jeopardy.
 
 
 54
 Neither count 1 nor 14 alludes to the conduct that gave rise to the contempt conviction. Furthermore, the abuse of interairline privileges was only mentioned by one witness at trial, and the criminal contempt convictions were never mentioned.
 
 
 55
 Merit implies that the contempt conviction constitutes a "wholly included lesser offense" of the wire fraud and conspiracy counts. This argument is meritless. The most that can be said is that both convictions involved evidence of the same conduct. Merit relies on Brown v. Ohio, 432 U.S. 161, 168 (1977) ("The greater offense is therefore by definition the 'same' for purposes of double jeopardy as any lesser offense included in it."). Yet Brown recognized that where each conviction "requires proof of a fact that the other does not," there is no double jeopardy, "notwithstanding a substantial overlap in the proof offered to establish the crimes." Id. at 166 (quoting Ianelli v. United States, 420 U.S. 770, 785 n. 17 (1975)). Comparing the offenses of contempt and wire fraud/conspiracy reveals that each requires proof of a fact that the other does not.
 
 
 56
 Nor does Grady v. Corbin, 110 S.Ct. 2084 (1990), support Merit's position. Proof of the Coral Air interairline abuse was neither required nor introduced to prove an essential element of the offenses in this case. Moreover, Grady reaffirms the principle that overlapping evidence in general is not barred by the Double Jeopardy Clause. See id. at 2093 & n. 12 (refusing to adopt test that "would prevent the government from introducing in a subsequent prosecution any evidence that was introduced in a preceding prosecution.").
 
 IX. The $1,000,000 Restitution Order
 
 57
 Merit contends that the district court's $1,000,000 restitution order was improper under the Victim and Witness Protection Act (VWPA), 18 U.S.C. §§ 3663-3664. We "review a restitution order for abuse of discretion as long as it is within the statutory framework." United States v. Sharp, 941 F.2d 811, 814 (9th Cir.1991).
 
 
 58
 Merit looks to Sharp, in which we stated that "[e]ven when the offense of conviction involves a conspiracy or scheme, restitution must be limited to the loss attributable to the specific conduct underlying the conviction." Id. at 815 (interpreting Hughey v. United States, 110 S.Ct. 1979 (1990) (superseded by Crime Control Act of 1990, Pub.L. No. 101-647, § 2509, 104 Stat. 4789, 4863 (1990) [to be codified at 18 U.S.C. § 3663(a)(3) ]). If Merit had been convicted only of wire fraud, which is an "offense of conviction involv[ing] a conspiracy or scheme," he would be justified in looking to Sharp for relief. Cf. id. ("[O]ne of the elements of wire fraud is the existence of an underlying scheme."). Here, however, the second offense of conviction was conspiracy.[6] The district court was therefore justified in taking into account the losses attributable to the conduct described in count 14, which alleged conspiracy to "fraudulently induc[e] investors throughout the United States to purchase more than $2,000,000 of Tracon common stock."
 
 
 59
 We reject Merit's argument that the court should have considered whether each investor's harm was actually attributable to the actions of his codefendants. Judge Broomfield noted that Merit's involvement in the case was "the most complete, most comprehensive and overreaching" of all the defendants, and "he was unquestionably the leader and planner, the organizer and if you would brains of the effort to manipulate and defraud others in this case." It is apparent that all of the investors were harmed by Merit's actions.
 
 
 60
 Merit, citing 18 U.S.C. § 3663(e)(1), also argues that the restitution order was improper in light of the fact that the investor-victims may ultimately recover through Tracon's plan of reorganization under Chapter 11. Merit's unsupported speculation that the victims may ultimately recover, however, falls short of the certain recovery contemplated by this section of the VWPA. Any future recovery can be credited against the restitution amount. Cf. Smith, 944 F.2d at 625.
 
 
 61
 Merit also claims that the order was improper because he was indigent. Even if he were indigent, the VWPA "does not prohibit a sentencing court from imposing a restitutionary sentence upon a defendant who is indigent at the time of sentencing." United States v. Keith, 754 F.2d 1388, 1393 (9th Cir.), cert. denied, 474 U.S. 829 (1985).
 
 
 62
 Finally, Merit argues that the district court failed to consider "the financial resources of the defendant, [and] the financial needs and earning ability of the defendant and the defendant's dependents," as required by 18 U.S.C. § 3664(a). Merit's presentence report, however, included information about these matters. Although the PSR indicates that Merit "does not have the capacity to pay an additional fine," it also indicates that he had had access to substantial funds. As in United States v. Schubert, No. 91-10165, slip op. 1811, 1815-16 (9th Cir. Feb. 24, 1992), the district court resolved the conflict against Merit. We affirm the restitutionary and other portions of Merit's sentence, as well as the sentences of his co-defendants.
 
 
 63
 AFFIRMED.
 
 
 
 *
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 It was not an appealable interlocutory order. The government could not appeal from an acquittal and would not appeal from a conviction
 
 
 [2]
 Although the defense made an initial hearsay objection when Myers first mentioned that he had received the phone call from the unidentified person (which is not hearsay), it did not object when Myers repeated the substance of the conversation (which is). The district court properly denied the defense's motion for mistrial on these grounds
 
 
 [3]
 Even if the victims were not in fact induced to buy Tracon stock by the defendants' misrepresentations, the government could still prove wire fraud. See United States v. Lindsey, 736 F.2d 433, 436 (7th Cir.1984) ("[I]t is not essential that the government allege or prove that purchasers were in fact defrauded, because it is only a scheme to defraud that is required to violate the law."); United States v. Utz, 886 F.2d 1148, 1150-51 (9th Cir.1989) (same), cert. denied, 110 S.Ct. 3242 (1990)
 
 
 [4]
 The government elicited testimony from one of its witnesses that Benary had falsely stated that he was not an officer, director, or owner of more than five percent of the stock of Tracon. Stock owned by such an individual is "Rule 144 stock" that cannot be sold. Furthermore, Exhibit 11 was a form filed by Tracon with the National Quotation Bureau with several lines asking about possible exemptions. Every entry was checked "none."
 
 
 [5]
 Benary testified in 1982. Merit gained his controlling share of Tracon stock from attorney John Kelly in 1983
 
 
 [6]
 Although the defendant in Sharp pled nolo contendere to a second count of "conspiracy to defraud the United States for failure to pay federal taxes," this count appears to have encompassed conduct separate from that alleged in the counts for wire fraud in furtherance of a "scam which grossed over $8.5 million." 941 F.2d at 813