**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Michael HARRIS, Defendant– Appellant.**

No. 97–10270.

United States Court of Appeals, Ninth Circuit.

Argued, Submission Deferred June 11, 1998.

Resubmitted June 18, 1998.

Filed July 30, 1999.

Mary McNamara, Assistant Federal Public Defender, San Francisco, California, for the defendant-appellant.

John D. Lyons, Assistant United States Attorney, San Francisco, California, for the plaintiff-appellee.

Before: WALLACE, T. G. NELSON, and KLEINFELD, Circuit Judges.

KLEINFELD, Circuit Judge.

This criminal case raises several questions, including whether the statute criminalizing false statements on ERISA reports [1] is unconstitutionally vague.

## FACTS

Harris was president of Harris Realty Company, Inc. His company (he owned a majority interest) had a pension plan for its employees. Pursuant to the plan, the employer was to contribute 12 ½ % of each eligible employee's total compensation per year on their behalf.

Over the fifteen years or so that the plan operated, Harris frequently took money out of the trust fund and loaned it to various entities in which he had an interest. Sometimes when he credited himself with a contribution to the trust fund, he actually gave the money directly to some other entity in which he had an interest, and gave the trust fund a promissory note. Harris invested much of the money credited to the ERISA trust fund in real estate development ventures with his brother-in-law, C.F. Humphreys, M.D.

Eventually Dr. Humphreys died, Harris Realty failed, the ventures in which the pension fund money had been invested failed, and Harris Realty's employees unsuccessfully sought their pension money. The pension money was gone. The trustee who took over from Harris reported that the plan had only $13,700 in assets, which was $938,000 short. The missing money went mostly into failed investments in Harris's various partnerships and uncollected promissory notes from Harris, Harris Realty, and Harris partnerships. Harris was convicted of theft from an ERISA plan,[2] false statements in ERISA documents,[3] and mail fraud.[4]

## ANALYSIS

I. Vagueness.

■ Two of the eight counts charged Harris with lying on two annual reports he filed. On the Form 5500 C/R's that he filed for plan years 1990–91 and 1992–93, the indictment says he falsely reported plan assets of over $900,000 and concealed facts necessary to check that claim. Harris argues that the statute was unconstitutionally vague as to him, because it was not clear what his reporting duties were. The statute makes it a crime to lie on a required ERISA form, or to conceal anything required to be disclosed or necessary to explain the report.[5]

■ We review a challenge to the constitutionality of a statute *de novo*.[6] The presumption is that a statute is constitutional.[7] Statutes are construed to avoid

---

1. 18 U.S.C. § 1027.

2. 18 U.S.C. § 664.

3. 18 U.S.C. § 1027.

4. 18 U.S.C. § 1341.

5. Whoever, in any document required by title I of the Employee Retirement Income Security Act of 1974 (as amended from time to time) to be published, or kept as part of the records of any employee welfare benefit plan or employee pension benefit plan, or certified to the administrator of any such plan, makes any false statement or representation of fact, knowing it to be false, or knowingly conceals,

covers up, or fails to disclose any fact the disclosure of which is required by such title or is necessary to verify, explain, clarify or check for accuracy and completeness any report required by such title to be published or any information required by such title to be certified, shall be fined under this title, or imprisoned not more than five years, or both.

18 U.S.C. § 1027.

6. *United States v. Hockings*, 129 F.3d 1069, 1070 (9th Cir.1997)

7. *United States v. National Dairy Products Corp.*, 372 U.S. 29, 32–33, 83 S.Ct. 594, 9 L.Ed.2d 561 (1963).

defects which would render them unconstitutional.[8]

This statute, as applied to Harris, was not unconstitutionally vague, because, as applied to him, it was clear what he should do: truthfully fill out the ERISA form according to the instructions. For plans with 100 or more participants, Congress required annual reports with audited financial statements and specified numerous disclosures that had to be made regarding assets.[9] The provisions are complex, but we need not consider them in this case. For plans covering fewer than 100 participants, Congress delegated to the Secretary the authority to "by regulation prescribe simplified annual reports."[10] The Secretary did so, adopting regulations that waive various requirements applicable to the larger plans and basically saying that plans with fewer than 100 participants need only file Forms 5500 C and R.[11] Harris Realty had fewer than 100 employees, so all it had to fill out was these forms.

■ A statute is void for vagueness if its prohibitions are not clearly defined, because people of ordinary intelligence ought to be able to know what is prohibited, and laws must provide explicit standards for those who apply them to avoid arbitrary and discriminatory enforcement by police, judges and juries.[12] This statute provides such explicit standards. As applied, the statute required Harris not to lie on the forms, and to disclose what the instructions told him to disclose. That gave him fair notice. As for whether the forms did or did not require the disclosures the government claims Harris should have made, we take that up in the section below on the sufficiency of evidence. There is nothing vague about this statute,

so construed. All a person has to do in order to comply is fill out truthfully the two forms, 5500 C and 5500 R (combined by the Secretary into Form 5500 C/R),[13] according to the instructions.

## II. Prior bad acts evidence.

■ The prosecution introduced evidence that Harris had misappropriated money from several limited partnerships of which he was a general partner. He was not charged with those misappropriations. The defense objected unsuccessfully, under Federal Rules of Evidence 404 and 403, and argues that the court committed prejudicial error by allowing the evidence to come in.

The defense argument was that whatever mismanagement and self-dealing Harris might have engaged in regarding his partnerships, the conduct was too dissimilar to what he did regarding the pension fund for it to be relevant. Moreover, the defense argues, the prejudice outweighed the relevance of the evidence, so even if admissible under Rule 404(b), it should have been excluded under Rule 403.

A defendant is entitled to have the government prove that he committed the crime charged, as opposed to proving that he is a bad person who should be convicted regardless of whether he committed the crime charged. Rule 404(b) prohibits a prosecutor from using evidence of uncharged bad acts of a defendant to prove that the defendant's character is such that the jury should infer that the defendant probably acted in conformity with his bad character.[14] The prosecution may, however, use evidence of other wrongs or acts than the crimes charged to prove material facts, such as absence of mistake.[15] Much of the defense argu-

**8.** *United States Civil Serv. Comm'n v. National Ass'n of Letter Carriers AFL–CIO,* 413 U.S. 548, 571, 93 S.Ct. 2880, 37 L.Ed.2d 796 (1973).

**9.** 29 U.S.C. § 1023(b).

**10.** 29 U.S.C. § 1024(a)(2)(A).

**11.** 29 C.F.R. §§ 2520.103–1(c); 2520.104–41.

**12.** *Grayned v. City of Rockford,* 408 U.S. 104, 108, 92 S.Ct. 2294, 33 L.Ed.2d 222 (1972); *Schwartzmiller v. Gardner,* 752 F.2d 1341, 1345 (9th Cir.1984).

**13.** 29 C.F.R. § 2520.103–1.

**14.** Fed.R.Evid. 404(b).

**15.** *Id.*

ment was that Harris had made unfortunate but innocent mistakes because he did not understand pension fund investment and reporting requirements, and that the loss of the pension money should be treated at most as a civil wrong because of the lack of fraudulent intent.

Harris's conduct in his other partnerships tended to prove absence of mistake. Though partnerships differ from pension trusts, stealing from them by a partner or fiduciary is similar, insofar as it is misappropriation of money held subject to a fiduciary duty to others. Harris's theory that he took the pension fund money only because he did not understand the technicalities of how he was supposed to handle it was far less credible because he acted similarly with partnership money, where the fiduciary duty was similar but the ERISA technicalities did not apply. Thus the other bad acts evidence tended to show that he acted with fraudulent intent and not through mistake.

Harris argues that the partnerships were different because the investors were very sophisticated and took big risks with their eyes open, so his big risks with their money were like "a defendant's handling of his own highly speculative stock portfolio in emerging markets, or his betting on horses, or his charitable gift giving." The analogy fails, because those uses involve a person's use of his own money, not other people's money. Even an investor in risky real estate development is not indifferent to whether the general partner bets the investment money at the track. A thief can steal from sophisticated as well as gullible victims, if he has possession of their money. A person who likes high risks with possible high returns may draw to an inside straight, but he is still entitled to have the dealer draw the next card from the top of the deck. Regarding the Rule 403 issue, the trial judge was within his discretion in deciding that the probative value of the evidence outweighed the risk of unfair prejudice. He could see the good faith theory of defense coming, and the partnership evidence would help the jury decide whether the good faith defense raised a reasonable doubt.

## III. Sufficiency of evidence.

Harris argues insufficiency of evidence as to all counts. He is entitled to prevail if no rational trier of fact could have found him guilty beyond a reasonable doubt.[16] We review *de novo*.[17]

As to the mail fraud counts, Harris argues that the government failed to prove the requisite intent. The statute[18] says that to commit that crime, one has to put something in the mail "for the purpose of executing" a scheme to defraud. The specific intent required is a purpose of execut-

**16.** *United States v. Tipton*, 56 F.3d 1009, 1012 (9th Cir.1995).

**17.** *Id.*

**18.** The relevant statute reads:

Whoever, having devised or intending to devise any scheme or artifice to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations, or promises, or to sell, dispose of, loan, exchange, alter, give away, distribute, supply, or furnish or procure for unlawful use any counterfeit or spurious coin, obligation, security, or other article, or anything represented to be or intimated or held out to be such counterfeit or spurious article, for the purpose of executing such scheme or artifice or attempting so to do, places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service, or deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier, or takes or receives therefrom, any such matter or thing, or knowingly causes to be delivered by mail or such carrier according to the direction thereon, or at the place at which it is directed to be delivered by the person to whom it is addressed, any such matter or thing, shall be fined under this title or imprisoned not more than five years, or both. If the violation affects a financial institution, such person shall be fined not more than $1,000,000 or imprisoned not more than 30 years, or both.
18 U.S.C. § 1341.

ing the fraudulent scheme or a purpose of attempting to execute the fraudulent scheme, when the person puts the item in the mail. There was evidence that Harris mailed the four letters charged to prevent disclosure of his theft of the money from the pension trust, which would be a purpose of executing the fraudulent scheme.

Harris argues on appeal that he lacked the requisite criminal intent because the government did not prove that the promissory notes were worthless, so the scheme was not proved to be fraudulent. The prosecutor repeatedly argued that when Harris exchanged trust fund money for a promissory note, he gave away "hard cold cash for a piece of paper." Harris correctly argues that this proposition, by itself, does not mean much. Anytime someone deposits coins and currency in a bank account, he trades cold hard cash for a piece of paper—mere marks on a deposit slip or passbook acknowledging that in exchange for his cold, hard cash, the bank promises to pay him money when he asks for it.[19] A trustee who sat for too long on currency and coins, instead of trading "cold hard cash" for "paper" would breach his fiduciary duty by sacrificing earnings, losing interest, and risking fire and theft. But the government's argument for a fraudulent scheme did not depend on worthlessness of the promissory notes, and the phrasing was not unfair or meaningless when taken in context. Rational jurors could conclude that Harris purposely took the money from the pension plan, and gave the plan promissory notes unlikely ever to be paid, knowing they were unlikely ever to be paid, so that he could use the money instead of leaving it for his employees' retirements. A pension plan that had $900,-000 on paper had almost nothing when Harris got done with it, except uncollectible notes from himself, his firm and his associates.

Harris argues that the government failed to prove the requisite intent for the counts regarding theft from an ERISA fund. The "essence of the crime is theft" which, from a pension plan, "includes a taking or appropriation that is unauthorized, if accomplished with specific criminal intent."[20] Lack of authorization may be shown "if the diversion is substantially inconsistent with the fiduciary purposes and objectives" of the pension plan.[21] Scienter is required, and the "act to be criminal must be willful, which means an act done with a fraudulent intent or a bad purpose or an evil motive."[22] A rational juror could conclude beyond a reasonable doubt that Harris had this *mens rea.* He diverted almost all the money in the plan, close to a million dollars, away from the secure investments that would fund his employees' retirements, and into the risky development projects he and his partners needed cash for. Intent could be inferred from the tricks and deceptions Harris used to cover up what he did.

Harris also argues that the evidence was insufficient to establish intent for counts 3 and 4, charging false reports on the Form 5500 C/R's. The forms have a blank for "total plan assets," and Harris filled in the blank with a total based on the face value of the promissory notes as well as other plan assets. The forms asked questions about self-interested loans and loans on which extensions had been granted, to all of which Harris checked the box to answer "No." On at least two of the questions, a rational juror could conclude beyond a reasonable doubt that Harris was intentionally falsifying:

> (e) Was there any loan or extension of credit by the plan to the employer, any fiduciary, any of the five most highly paid employees of the employer, any owner of a 10% or more interest in the employer, or relatives of any such persons?

---

19. *Reliance Insurance Co. v. U.S. Bank,* 143 F.3d 502, 506 (9th Cir.1998).

20. *United States v. Andreen,* 628 F.2d 1236, 1241 (9th Cir.1980).

21. *Id.*

22. *Id.*

(f) Did the plan acquire or hold any employer security or employer real property?

Harris took money out of the plan and put it into Harris Realty's account, giving the plan a promissory note for the money. When he did that during a year covered by the form, as he did, it was unquestionably an extension of credit to the employer, requiring a "yes" answer to question 15(e). Also, when the plan held promissory notes from Harris Realty, as it did during the relevant years, Harris was obligated to answer "yes" to the question whether the plan held "any employer security." The instructions say an "employer security" includes "notes." These boxes were where Harris had to reveal that the pension plan was a nearly empty container because he had misappropriated the money. His false answers hid that fact.

## IV. Instructions.

■■■ Harris asked for but did not get instructions explaining to the jury the nature of promissory notes. He argues that their absence deprived him of an instructional basis for his theory of the case, good faith. This argument fails, because the judge gave an express good faith instruction. The judge instructed the jury that good faith was a complete defense, that the defendant did not have to bear the burden of proving it, that the government had to prove the mental element on each count beyond a reasonable doubt, and that an honest mistake would not suffice to establish criminal intent. The case did not turn on whether the jury correctly understood some aspect of the law of bills and notes, and Harris could be convicted or acquitted whether the notes were enforceable or unenforceable. The judge has discretion in the formulation of jury instructions,[23] and was within his discretion in not defining and explaining promissory notes in this case.

## V. Cross examination.

■■■ Harris argues that the trial judge committed constitutional error by preventing him from cross examining several prosecution witnesses regarding bias. The most significant was Judy Humphreys. She was Harris's sister. She was also the widow of Harris's frequent investment partner, C.F. Humphreys, M.D., who died a few months before trial. The district court's decision to limit the scope of cross-examination is reviewed for abuse of discretion.[24]

The pension trust (a new trustee took it over from Harris) was suing Dr. Humphreys' estate, at the time Mrs. Humphreys testified. As the widow, who presumably benefitted under the terms of Dr. Humphreys' will, she might lose money from her inheritance to the extent the pension trust succeeded. The lawsuit was to recover on Dr. Humphreys' promissory note for about $200,000, relating to a medical building Harris and Dr. Humphreys had built on Dr. Humphreys' land. Dr. Humphreys' estate was defending on the theory that the note was not valid. Harris's lawyer sought to develop the facts of the lawsuit to show that Mrs. Humphreys' testimony might be tainted by bias against him, despite her being his sister, because the estate she would inherit would be substantially larger if he was convicted. Establishing his fraud might collaterally estop him from denying it in the civil suit, and could come into evidence to diminish his credibility.

But the judge would not let Harris's lawyer ask Mrs. Humphreys anything about this lawsuit. Nor would he let Harris's lawyer ask her whether she was the sole beneficiary of Dr. Humphreys' will. The basis for the ruling appears to be that the examination would go too far afield from the direct examination.

■■■ A similar issue arose with Harris Realty's former employees. Several testi-

---

**23.** *See United States v. Service Deli Inc.,* 151 F.3d 938, 942 (9th Cir.1998) ("A district court's formulation of jury instructions is reviewed for abuse of discretion.").

**24.** *See United States v. Manning,* 56 F.3d 1188, 1197 (9th Cir.1995).

fied against Harris and were also suing him for breach of fiduciary duty. The judge allowed Harris's lawyer to ask them during cross examination about the nature of their dispute with Harris but not how much money they were suing him for.

 In these rulings, the district court abused its discretion. A defendant has a constitutional right under the Confrontation Clause to cross examine prosecution witnesses for bias, by showing their possible motivation to falsify their testimony against him.[25] Though the district court can exercise discretion to avoid undue consumption of time and confusion of issues in the cross examination, these legitimate concerns cannot justify so severe a limitation as to prevent the jury from finding out what it needs in order to judge rationally whether the witnesses might be lying or shading the truth. Cross examination for bias is often on topics outside the scope of the direct examination, but that is not a reason to exclude inquiry into the potential bias. Pecuniary interest may be shown to prove bias.[26] A defendant may ordinarily cross examine a prosecution witness to prove bias by proving that the witness is suing him.[27] The amount at issue is ordinarily admissible, because the jury may reasonably believe that the willingness of a witness to lie or shade testimony would be affected, not only by whether the result may benefit him, but also by how much. Some people would lie under oath for a lot of money but not for a little.

In this case, Mrs. Humphreys might be hundreds of thousands of dollars worse off if a major chunk of her husband's estate were transferred to Harris's former employees instead of to her. Some people would lie or shade the truth for a couple of hundred thousand dollars, even against a close relative. Yet all the jury found out about Mrs. Humphreys' relationship with Harris was that they were sister and brother, which might make them think she was biased in his favor. They never found out about the money. Likewise, Harris's former employees might be hundreds of thousands of dollars better off if they could use the criminal judgment against Harris as issue preclusion in their civil suits, and use his conviction to harm his credibility as a witness in those suits. Harris was not allowed to prove any of this. He should have been. At least as to Mrs. Humphreys, the limitation on cross examination was so complete as to amount to violation of Harris's constitutional right of confrontation and not merely abuse of discretion.

 Where the limitation on cross examination is so complete as to amount to a denial of the constitutional right of confrontation, the question on appeal is whether the error was harmless beyond a reasonable doubt.[28] It was. There was overwhelming evidence that Harris had looted almost all the money, about $900,-000, from the pension plan, had lied on the tax forms, and had mailed lulling letters to cover up the theft. Even if the jury had decided that Humphreys and the employees were so biased that it could not accept as true anything they said, it would have made no difference. These witnesses were emotional frosting on a financial cake. Their testimony might show the jury that the crimes at issue really hurt people and were not merely technical. But even if all the frosting were stripped off, there remained the problem (for Harris) of the cake. Whether anyone was impoverished or deprived of money they really needed or not, there remained overwhelming evi-

**25.** *Davis v. Alaska*, 415 U.S. 308, 316, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974).

**26.** *United States v. Dees*, 34 F.3d 838, 844 (9th Cir.1994); *United States v. Carreon*, 572 F.2d 683 (9th Cir.1978) (per curiam).

**27.** *Villaroman v. United States*, 184 F.2d 261, 261–62 (D.C.Cir.1950); *United States v. Gam-* *bler*, 662 F.2d 834, 837–38 (D.C.Cir.1981). In *Gambler*, barring the amount as an unnecessary detail was not an abuse of discretion because the witness's lawsuits against the defendant had been settled and terminated.

**28.** *United States v. Dees*, 34 F.3d 838, 844–45 (9th Cir.1994).

dence that Harris had committed the theft, false reporting, and mail fraud.

■ Harris also argues that the court erred by disallowing more extensive cross examination of his former co-owner of Harris Realty, Janet Christiano. As Harris Realty fell apart, she started her own business. Harris sued her for interfering with his business by taking away his employees and clients. The judge allowed proof of the lawsuit but prevented Harris from proving the details of the pleadings and underlying facts. Harris's lawyer was not allowed to ask Christiano on cross whether she was accurate when she described herself as "loyal." This limitation on cross examination was within the court's discretion, because Harris's lawyer was allowed to prove enough about the lawsuit to show bias, the materiality and bearing on credibility of the inquiry into Christiano's self-description was slight, and the risk of confusion and undue consumption of time were substantial.

AFFIRMED.