**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

RAYMOND ERIKSEN,
          *Defendant-Appellant.*

No. 10-30056

D.C. No.
2:08-cr-00404-
JCC-1

UNITED STATES OF AMERICA,
          *Plaintiff-Appellee,*

          v.

SIGMUND ERIKSEN,
          *Defendant-Appellant.*

No. 10-30057

D.C. No.
2:08-cr-00404-
JCC-2

ORDER
AMENDING
OPINION AND
DENYING
PETITION FOR
PANEL
REHEARING AND
AMENDED
OPINION

Appeals from the United States District Court
for the Western District of Washington
John C. Coughenour, District Judge, Presiding

Argued and Submitted
January 11, 2011—Seattle, Washington

Filed March 9, 2011
Amended May 23, 2011

6743

Before: Susan P. Graber and Milan D. Smith, Jr.,
Circuit Judges, and Roger T. Benitez,* District Judge.

Opinion by Judge Milan D. Smith, Jr.

---

*The Honorable Roger T. Benitez, United States District Judge for the
Southern District of California, sitting by designation.

**COUNSEL**

C. James Frush, Esq., Jack M. Lovejoy, Esq., Cable Langen-bach Kinerk & Bauer LLP, Seattle, Washington, and David Allen, Esq., Allen Hansen & Maybrown, Seattle, Washington, for the defendants-appellants.

Micahel S. Morgan, Esq., Assistant United States Attorney, Western District of Washington, Seattle, Washington, for the plaintiff-appellee.

**ORDER**

We hereby direct the Clerk of Court to strike Appellants' reply brief in support of their petition for rehearing (Docket No. 43).

The Opinion filed March 9, 2011, 2011 WL 801816 (9th Cir. Mar. 9, 2011), is amended as follows:

(1) At page 3305 of the slip opinion, in the paragraph which begins with the words, "On December 5, 2001, the Eriksens", delete the following two sentences:

Thereafter, Braley memorialized the conversation in an email he transmitted to the Eriksens. That email reads, in part: "Apparently, for the past year and one half, they have failed to contribute to the 401(k) . . . Plan after taking elective deferrals from employees."

(2) Insert the following in place of the deleted sentences:

Thereafter, Braley memorialized the conversation in an email that reads, in part: "Apparently, for the past year and one half, they have failed to contribute to the 401(k) . . . Plan after taking elective deferrals from employees."

With the foregoing amendment, the panel has unanimously voted to deny Appellants' petition for panel rehearing. The petition for rehearing is DENIED.

No further petitions for rehearing or rehearing en banc will be entertained in this case.

---

## OPINION

M. SMITH, Circuit Judge:

Defendants-Appellants Sigmund Eriksen and Raymond Eriksen appeal their convictions stemming from their misappropriation of employee 401(k) contributions to pay their company's operating expenses. Specifically, a jury convicted each Defendant of two counts of Embezzlement or Conversion of the Funds of an Employment Benefit Plan, in violation of 18 U.S.C. § 664, and one count of Making False or Misleading Statements in an Employee Retirement Income Security Act of 1974 (ERISA) Benefit Plan Document that Federal Law Requires to be Kept, in violation of 18 U.S.C. § 1027. Defendants claim that the district court erred in several ways. We address Defendants' principal assignments of error in this

Opinion. We address Defendants' other claims of error in a contemporaneously filed Memorandum Disposition. We affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### I. Lunde Electric Company Pension Plan

Until 2005, when it ceased operations, Lunde Electric Company (Lunde Electric or the Company) of Seattle, Washington, was in the business of maritime electrical repair. Sigmund Eriksen (Sigmund) served as Lunde Electric's Chairman, and his son Raymond Eriksen (Raymond) was President and Chief Executive Officer.

Sigmund purchased Lunde Electric in 1975. In 1979, the Company established the Lunde Electric Co., Inc., Profit Sharing Plan (the Plan) to provide retirement benefits for its union employees. Sigmund and Raymond served as the Plan's trustees. Initially, Lunde Electric was the sole financial contributor to the Plan, and the Plan's assets were held in a brokerage account at a local bank (the Plan Account). From 1979 until the mid-1990s, Earl Sommerfeld served as the Plan's bookkeeper. In 1999, Earl's son, Brad Sommerfeld, assumed those responsibilities.

The Plan was amended in 1984 and 1991 (the 1991 Plan). The government and Defendants sharply disagree as to whether the Plan was subsequently amended. According to the government, the Plan was again amended in 1995 and then restated in 2002. Defendants contend that there is no evidence of either event.

### A. The 1995 Amendment and 2002 Restatement

According to the government, Article IV of the Plan, titled "Contribution and Allocation," was amended in 1995 to add a 401(k) feature (the 1995 Amendment). The 1995 Amend-

ment replaced contributions made exclusively by the Company with a system whereby Plan investors—called "Participants"—contributed a percentage of their paychecks —called "elective deferrals"—into the Plan. Lunde would then "match" fifty percent of each Participant's elective deferral with an employer contribution. Funds in the Plan Account were pooled and administered by the Eriksens.

According to the government, when the Eriksens added the 401(k) feature, they did not redraft the 1991 Plan; instead, only Article IV of the 1991 Plan was amended. As evidence of this change, the government introduced two versions of the 1991 Plan. In the first version, which the government proffered as the original 1991 Plan, Article IV refers only to discretionary "Employer's Contribution[s]": "For each Plan Year, the Employer shall contribute to the Plan such amount as shall be determined by the Employer." However, in the second document, Article IV sets forth procedures for a "Participant's Salary Reduction Election." Article 4.2 of that document provides, *inter alia*, that "[e]ach Participant may elect to defer his Compensation which would have been received in the Plan Year, but for the deferral election, by up to 10 [percent]." In addition to the documentary evidence, the government presented testimony that the Plan was amended in 1995. For instance, the Plan's stockbroker testified that new "trust certification papers" were filed with the Plan's brokerage firm in 1995.

On January 1, 2002, the Plan was restated and a new document titled "Lunde Electric Company, Inc. 401(k) Profit Sharing Plan" became operative (the 2002 Restatement). Although the date of the Plan's effectiveness was not written in one space provided in the document, several documents signed and dated by Sigmund and Raymond contained information about the 2002 Restatement's effective date. These included a "Consent to Corporate Authorization," which "RESOLVED that the form amended 401(k) Profit Sharing Plan and Trust effective January 1, 2002, presented to this meeting is hereby

approved and adopted." Additionally, the 2002 Restatement included a "Supplemental Participation Agreement" dated January 1, 2002, and signed by Raymond as "Participating Employer" and by both Raymond and Sigmund as Trustees. This document also referred to a 401(k) plan.

## B.  Missing Remittances to the Plan Account

In 1999, Lunde Electric began experiencing financial difficulties and was unable to pay its operating expenses with revenues. The government alleged that, as a result of these financial problems, the Eriksens caused the Company to stop remitting elective deferrals to the Plan.

Brad Sommerfeld regularly reviewed the Trust's brokerage statements as part of his responsibilities as Plan accountant. Those statements reflected deposits into and withdrawals from the Plan Account. Sommerfeld noticed that regular deposits into the Plan Account were no longer made after October 1999. Indeed, the only deposit made to the Plan Account for the 2000 Plan Year was for $10,000, on December 27, 2000. Although money continued to be withheld from Participants' paychecks, no deposits were made into the Plan Account in 2001, in 2002, or from January through March 2003.

From 1999 to 2002, Lunde Electric employed three different bookkeepers—Cynthia Halcomb (mid-1990s to 1999), Brad Mansker (May 2000 to December 2000), and Toni Wunsch (December 2000 to 2003). Both Halcomb and Mansker testified that they would meet with the Eriksens on a regular basis to decide which bills to pay. According to Mansker, within a few months of his starting work at the Company, he learned that elective deferrals were not being remitted to the Plan. Mansker testified that he raised the issue of the outstanding liability on several occasions, but that the Eriksens did not direct the Company to make payments to the Plan during his tenure. Moreover, starting in 1999, employees' elec-

tive deferrals were shown as "Receivables" on the Plan's balance sheet and reflected as a liability on Lunde Electric's books. From 1999 to December 2002, the Plan Account's Receivables grew from $35,156.62 to $97,374.68. By 2003, the Receivables had increased to $103,606; from 1999 to 2003, the Receivables ballooned from 1.47 % of the Plan's assets to 15.01%.

On December 5, 2001, the Eriksens participated in a conference call with attorney Ronald Braley. Defendants asked Braley about the consequences of not funding 401(k) trust accounts. Braley informed the Eriksens that they could be personally liable as fiduciaries and, in his own words, informed them "that while the Department of Labor usually does not take a keen interest in plans with fewer than 100, if an employee knew about it and complained to the Department of Labor, that an investigation may open up and they would have a more serious issue." During the conference call, Braley emphasized that the Eriksens had to pay the unfunded liability "as soon as possible." Thereafter, Braley memorialized the conversation in an email that reads, in part: "Apparently, for the past year and one half, they have failed to contribute to the 401(k) . . . Plan after taking elective deferrals from employees."

On May 2, 2002, Brad Sommerfeld wrote to bookkeeper Toni Wunsch concerning the Company's accounting:

> As you know the Company is significantly behind in depositing its 401K contributions. This is a huge problem because most of the money comes from employees' paychecks and the Officers of the Company and Trustees of the Plan have a fiduciary responsibility to deposit these funds timely (deposits are due monthly). This is possibly the worst liability to fall behind on in terms of legal and tax problems.

Sommerfeld testified that he also had a conversation with Sigmund about the Plan's delinquency and that Sigmund stated, "We're doing the best we can."

## C. Lunde Electric's Tax Filings

After 1995, Lunde Electric began providing yearly "Participant's Valuation Reports" to employees enrolled in the 401(k) Plan. These reports purported to show each Participant's assets in the Plan and contributions made for the prior Plan Year. The Valuation Reports were prepared by Brad Sommerfeld and signed by Raymond. Until 1999, a Statement of Net Assets, which detailed the total Plan assets, was also delivered to each Participant. After the 1999 Plan Year, Lunde Electric ceased providing Statements of Net Assets when it delivered copies of Valuation Reports to Participants. Nevertheless, Sommerfeld continued to prepare Statements of Net Assets for those years, which he provided to the Eriksens.

Lunde Electric filed certain documents with the Internal Revenue Service (IRS), including a Form 5500, in connection with its operation of the Plan. Form 5500, titled, "Annual Return/Report of Employee Benefit Plan," details contributions made to an ERISA fund. Brad Sommerfeld prepared the Form 5500 each year, and either Raymond or Sigmund, as Plan administrators, signed the document before submitting it to the IRS.

Among other questions, Form 5500 asks: "Was there a failure to transmit to the plan any participant contributions within the time period described in 29 [Code of Federal Regulations (C.F.R.)] 2510.3-102?" The reference to the Code of Federal Regulations is to an ERISA regulation titled "Definition of 'plan assets'—participant contributions" (the Plan Asset Regulation), which provides:

> (a)(1) General rule. For purposes of subtitle A and
> parts 1 and 4 of subtitle B of title I of ERISA and

section 4975 of the Internal Revenue Code only (but without any implication for and may not be relied upon to bar criminal prosecutions under 18 U.S.C. 664), the assets of the plan include amounts (other than union dues) that a participant or beneficiary pays to an employer, or amounts that a participant has withheld from his wages by an employer, for contribution or repayment of a participant loan to the plan, as of the earliest date on which such contributions or repayments can reasonably be segregated from the employer's general assets.

. . . .

(b) Maximum time period for pension benefit plans.

(1) . . . [I]n no event shall the date determined pursuant to paragraph (a)(1) of this section occur later than the 15th business day of the month following the month in which the participant contribution or participant loan repayment amounts are received by the employer (in the case of amounts that a participant or beneficiary pays to an employer) or the 15th business day of the month following the month in which such amounts would otherwise have been payable to the participant in cash (in the case of amounts withheld by an employer from a participant's wages).

29 C.F.R. § 2510.3-102(a)(1), (b)(1). For the 1999, 2000, and 2001 tax years, the Form 5500s filed by Lunde Electric indicated that all Participant contributions had been transmitted. Sommerfeld testified that this was not true and that he had falsified the three forms because:

The answer yes is a flag to the Internal Revenue Service that the plan is delinquent or behind on their contributions. And that may—or would result in

either an IRS audit or a Department of Labor investigation. And I was afraid that I would be blamed for blowing the whistle or causing either one of those actions to take place and cause harm to the company.

### D.   Department of Labor Investigation and Indictment

In early 2003, bookkeeper Wunsch discussed her concerns about the 401(k) Plan with the Eriksens. Thereafter, Wunsch contacted the Department of Labor (DOL) and met with an investigator. In March 2003, the DOL issued a grand jury subpoena to Lunde Electric. After the April 2003 subpoena was served, Lunde Electric resumed remitting elective deferrals to the Plan. By October 2004, Lunde Electric had lowered its outstanding obligations to the Plan from approximately $105,000 to $1,000. When Lunde Electric ceased operations in April 2005, all Plan Participants received their full 401(k) distribution.

In 2008, based on the events detailed *supra*, Sigmund and Raymond were indicted on one count of Conspiracy to Embezzle $70,120.55 from an ERISA Employee Plan, in violation of 18 U.S.C. § 371 (Count 1); seventeen counts of Embezzlement or Conversion from an ERISA Employee Benefit Plan, in violation of 18 U.S.C. §§ 664 and 2 (Counts 2-18), and three counts of Making False or Misleading Statements in an ERISA Benefit Plan Document that Federal Law Requires to be Kept, in violation of 18 U.S.C. §§ 1027 and 2 (Counts 19-21).

### II.   Trial and Sentencing

The Eriksens' jury trial commenced on October 5, 2009. Raymond testified that he did not play a role in preparing any of the Plan's documents and that he did not remember signing the 1995 Amendment establishing the 401(k). According to Raymond, neither he nor Sigmund was involved in the preparation or review of the Valuation Reports, the Form 5500s, or

the Plan's Statements of Net Assets. Raymond testified that he was unaware that employee elective deferrals were not being forwarded to the Plan Account in 1999, 2000, and 2001. However, Raymond acknowledged making personal contributions to the 401(k) starting in October 1999.

At trial, the Eriksens presented the testimony of William Whitman, an expert witness on ERISA issues. Although Whitman testified that there are no "hard deadlines" for when an employer must contribute the *employer* portion of a 401(k) plan, he did not testify about when an employer must remit *employee* contributions. According to Whitman, an amendment to an ERISA plan must be "in writing" and executed by a corporate officer and the plan's trustees.

The jury returned identical verdicts for both Defendants, convicting them on Counts 17 and 18, for failing to remit elective deferrals from December 2002 and March 2003 paychecks. The jury also convicted Defendants on Count 21, which concerned making a false statement in the 2001 Valuation Report. The jury deadlocked on Counts 9 through 16 and 20 and acquitted Defendants on Counts 1 through 8 and 19. Defendants moved for judgments of acquittal, which the district court denied in an order dated November 4, 2009.

The district court sentenced both Defendants to two years of probation, a $20,000 fine, 240 hours of community service, and the mandatory special assessment of $300. Defendants timely appeal.

## DISCUSSION

Defendants seek to overturn the jury's verdict on the grounds that there was insufficient evidence of criminal intent or that Lunde Electric established the 401(k) Plan, and that the government improperly referred to the Plan Asset Regulation at trial. We are not persuaded.

## I.   Embezzlement or Conversion of the Elective Deferrals

### A.   Scope of the Offense

**[1]** Defendants were convicted under 18 U.S.C. § 664 for embezzling or converting the Plan's assets in December 2002 and March 2003. Section 664 provides:

> Any person who embezzles, steals, or unlawfully and willfully abstracts or converts to his own use or to the use of another, any of the moneys, funds, securities, premiums, credits, property, or other assets of any employee welfare benefit plan or employee pension benefit plan, or of any fund connected therewith, shall be fined under this title, or imprisoned not more than five years, or both.

> As used in this section, the term "any employee welfare benefit plan or employee pension benefit plan" means any employee benefit plan subject to any provision of title I of the Employee Retirement Income Security Act of 1974.

18 U.S.C. § 664. We have held that the operative terms "embezzles" and "converts" are to be given their common-law meanings. *United States v. Andreen*, 628 F.2d 1236, 1241 (9th Cir. 1980)*; Woxberg v. United States*, 329 F.2d 284, 290 (9th Cir. 1964). Thus, "[e]mbezzlement is the fraudulent appropriation of property by a person to whom such property has been entrusted, or into whose hands it has lawfully come." *Woxberg*, 329 F.2d at 290; *see also Andreen*, 628 F.2d at 1241 (citing *United States v. Dupee*, 569 F.2d 1061, 1064 (9th Cir. 1978)). Conversion "encompasses the use of property, placed in one's custody for a limited purpose, in an unauthorized manner or to an unauthorized extent." *Andreen*, 628 F.2d at 1241 (citing *Morissette v. United States*, 342 U.S. 246, 272 (1952)).

We have also recognized that § 664 does more than recapitulate common-law offenses. Because § 664 and other pension-protection laws, *see, e.g.*, 29 U.S.C. § 501(c) (prohibiting embezzlement from a labor organization fund), are aimed at "preserv[ing] welfare and pension funds for the protection of those entitled to their benefits," we have held that § 664 imposes liability for a broad class of "unauthorized" acts willfully committed by those in a fiduciary or advisory capacity. *See Andreen*, 628 F.2d at 1241, 1242 (examining the legislative history of 29 U.S.C. § 501, 18 U.S.C. § 664). As then-Judge Kennedy explained:

> The essence of the crime is theft and in the context of union funds or pension plans the offense includes a taking or appropriation that is unauthorized, if accomplished with specific criminal intent. In this respect lack of authorization may be shown if the diversion *is substantially inconsistent with the fiduciary purposes and objectives of the union funds or pension plan*, as set forth by statutes, bylaws, charters, or trust documents which govern uses of the funds in question. Whatever imprecision attends this definition is remedied substantially by the requirement of scienter, which is an essential element of the crime. The act to be criminal must be willful, which means an act done with a fraudulent intent or a bad purpose or an evil motive.

*Id.* at 1241 (emphasis added) (citation omitted).

**[2]** We have consistently declined invitations to engraft additional elements onto, or create affirmative defenses for, § 664 violations. In *Andreen*, we rejected the "participant benefit" theory by holding that so long as a fiduciary used plan assets in an unauthorized manner, the "lack of benefit to the [plan beneficiaries] is not an element of the offense required to be shown as part of the prosecution's case." *Id.* at 1242. Likewise, "the conferring of any benefit in such a case is not

a defense, except insofar as it may bear upon the defendant's state of mind in committing the acts in question." *Id.* at 1242-43. We thus rejected the appeal of an attorney who had assisted the trustees of a pension plan in drafting an unauthorized compensation plan that rewarded the trustees for merely executing their fiduciary duties. *Id.* at 1245-46. We reasoned that the attorney's attendance at trustee meetings where the compensation plan was discussed, coupled with his knowledge that the "plan was unauthorized," was sufficient to show that he aided and abetted a violation of § 664. *Id.* at 1246.

In *United States v. Ford*, a companion case to *Andreen*, we affirmed the convictions of the trustees whom Andreen had assisted. 632 F.2d 1354 (9th Cir. 1980), *overruled on other grounds, as recognized in United States v. Miller*, 874 F.2d 1255, 1268 (9th Cir. 1989). In reviewing a sufficiency-of-the-evidence challenge, we highlighted repeatedly certain circumstantial facts that showed the trustees' awareness that their behavior was not authorized by the trusts' beneficiaries— primarily that the trustees were offering *themselves* benefits from the trust at a lower cost than was available to beneficiaries. *Id.* at 1366, 1367 n.12, 1368.

In two related appeals, *United States v. Mett*, 178 F.3d 1058 (9th Cir. 1999), and *United States v. Wiseman*, 274 F.3d 1235 (9th Cir. 2001), we again disavowed a participant-benefit defense and further held that ERISA-plan fiduciaries could not be implicitly authorized to use assets in a manner that jeopardizes their availability for the beneficiaries. *Mett*, 178 F.3d at 1067-68. *Mett* and *Wiseman* were separate appeals of the same underlying prosecution against two executives of an art gallery who withdrew $1.6 million from a pension plan to finance their floundering enterprise. *Id.* at 1060-61. Mett, the gallery's president, and Wiseman, the vice-president, served as the trustees of two pension benefit plans. *Id.* at 1060. After being indicted for felony art fraud, their gallery "fell on hard times," and the trustees withdrew money from pension plans and deposited it into the company's general operating account

without informing the employees-beneficiaries. *Id.* at 1060-61. While Mett and Wiseman admitted making the withdrawals, they sought to avoid liability by characterizing their appropriations as implicitly authorized "loans" necessary for the business to survive. *Id*. at 1060. This implied authorization was founded on the premise that, because the gallery would have had to be closed and the employee-beneficiaries "would otherwise have been laid off and faced with unemployment," *id.*, the acts were not criminal.

We rejected the "implied authorization" defense based on a fiduciary's purported intention to serve the "broader" interests of employee welfare. *Id.* at 1067. Because ERISA funds are protected so that they will be "available at retirement"— and are therefore subject to numerous non-alienation restrictions—we observed that an "authorization" argument was illogical. After all, if the beneficiaries themselves are not at liberty to dispose of the funds for a purpose other than retirement, they could not lawfully authorize someone else to do it for them. *Id.* at 1068 ("[I]t is little different from arguing that complete strangers 'authorized' the illicit transactions.").

**[3]** Following retrial in light of other errors, the *Mett* defendants returned to us in *United States v. Wiseman*, claiming that the district court had committed new errors by not giving a mistake-of-law instruction or an instruction that the government had to show the defendants were not "borrowing" from the pension. 274 F.3d at 1241. We rejected both contentions. With respect to the mistake-of-law argument, we held that, although " 'the defendant must knowingly act wrongfully to deprive another of property,' there is no requirement that the defendant also know his conduct was illegal." *Id.* at 1240 (alterations and internal quotation marks omitted). We likewise rejected the gallery executives' "borrowing"-from-the-pension-fund defense. *Id.* at 1241. We stated that evidence of borrowing, or for that matter evidence of intent to repay, *is* relevant to criminal intent, but that "[i]ntent to repay generally is not a defense to embezzlement . . . [or] conversion."

*Id.* (citing *United States v. Ross*, 206 F.3d 896, 899 (9th Cir. 2000)); *see also United States v. Thordarson*, 646 F.2d 1323, 1335 n.22 (9th Cir. 1981).

## B.   Sufficiency of the Evidence

The jury convicted Defendants of two § 664 crimes: Counts 17 and 18. Count 17 concerned $1,192.40 of employee elective deferrals withheld in December 2002. Count 18 involved $1,000.40 in deferrals from March 2003. The district court gave the same jury instruction for both of these counts, requiring proof beyond a reasonable doubt that:

> First, the Lunde Electric Company 401(k) Plan was established or maintained as an employee pension benefit plan subject to Title I of the [ERISA]; and
>
> Second, the defendant either:
>
> > (a) embezzled or stole funds of the plan; or
> >
> > (b) unlawfully and willfully abstracted or converted funds of the plan to his own use or the use of another[.]

The district court defined "embezzled," "stole," "converted," and "abstracted."

Defendants contend that there was insufficient evidence to support these elements. "Evidence is sufficient for conviction if, viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *United States v. Bush*, 626 F.3d 527, 533 (9th Cir. 2010) (internal quotation marks omitted).

In a mid-trial motion for a directed verdict, Defendants asserted that the government had not established the existence

of the Plan and thus claimed that any deferrals withheld were actually discretionary employer contributions. This argument was not renewed in Defendants' post-trial Fed. R. Crim. P. 29 motion. Defendants also assert that the failure to remit elective deferrals within the time frame established by the DOL's Plan Asset Regulation, 29 C.F.R. § 2510.3-102(b)(1), is not tantamount to embezzlement or conversion and that the government's references to the Plan Asset Regulation were prejudicial. Because Defendants' Rule 29 motion regarding Counts 17 and 18 was limited to an argument about *mens rea*, our review is for plain error. *United States v. Alvarez-Valenzuela*, 231 F.3d 1198, 1200-01 (9th Cir. 2000) ("[W]e interpret Rule 29(a) to suggest that failure to renew the motion at the end of trial does not mean that it has been waived, but only that a higher standard of review is to be imposed. [We] may review an unrenewed motion for judgment of acquittal, but only to prevent a manifest miscarriage of justice, or for plain error.").

### 1.    Establishment of the Lunde Electric 401(k) Plan

Defendants assert that there was insufficient proof that the Plan contained a 401(k) feature. They argue that all ERISA plans contain an amendment procedure and that "[t]hese . . . procedures, once set forth in a benefit plan, constrain the employer from amending the plan by other means." *Winterrowd v. Am. Gen. Annuity Ins. Co.*, 321 F.3d 933, 937 (9th Cir. 2003) (citing *Curtiss-Wright Corp. v. Schoonejongen*, 514 U.S. 73, 85 (1995)). According to Defendants' theory, the government had to introduce a properly executed version of the 1995 Amendment. Because the government does not have such a document, Defendants argue, the elective deferrals were actually discretionary "employer contributions" that do not become "Plan Assets" until they are remitted to the Plan.

Defendants' argument regarding the validity of the 1995 Amendment is a red herring. Defendants were convicted only for their failure to remit deferrals after the 2002 Restatement. Even though the Form 5500s submitted to the IRS by Lunde

Electric, the testimony of Brad Sommerfeld, and the email by attorney Braley all indicated that the 401(k) Plan existed before 2002, because Counts 17 and 18 concerned conduct that occurred after the 2002 Plan Restatement, we need only consider that document. The Eriksens do not dispute that the 1991 Plan was governed by Title I of ERISA, but contend that the evidence did not allow the conclusion that the Plan was thereafter amended or restated.

[4] "Generally, whether a plan is subject to Title I of ERISA is an issue of fact to be decided by the jury, guided by applicable legal principles." *United States v. Wofford*, 560 F.3d 341, 347 (5th Cir. 2009) (citing *United States v. Helbling*, 209 F.3d 226, 239 (3d Cir. 2000)). The amendment procedures for any ERISA benefit plan must be specified by the employer and identify the persons with the "authority to amend." *Winterrowd*, 321 F.3d at 937 (citing 29 U.S.C. § 1102(b)(3)). Here, the 1991 Plan, at Section 10.6, specified that amending the Plan "shall only be by the written action of each and every Participating Employer and with the consent of the Trustee where such consent is necessary." To show such an amendment occurred by at least 2002, the government introduced a written copy of the 2002 Restatement, which included a 401(k) provision and was signed by Raymond as "Employer" and "Trustee" and by Sigmund as "Trustee." The government also introduced addenda referring to the effective date of the Restatement as January 1, 2002, as well as a "Consent to Corporate Action" by Lunde Electric that approved the "amended 401(k) Profit Sharing Plan . . . effective January 1, 2002." Any of these documents alone was competent evidence to allow the jury to conclude that the Plan had been restated in 2002 *with* a 401(k) plan. Accordingly, there was sufficient evidence for the jury to conclude that the 1991 Plan had been restated before the Eriksens retained their employees' elective deferrals in the Company's general account.

## 2.  Embezzlement, Conversion, or Unauthorized Use of Funds

The second element of § 664 requires the jury to find that a defendant willfully embezzled, converted, or misappropriated the funds of a pension plan. *Andreen*, 628 F.2d at 1241. Defendants concede that the funds were not remitted to the Plan Account before the DOL investigation. However, they contend that their keeping elective deferrals for longer than fifteen days—a deadline specified in the Plan Asset Regulation—is not tantamount to embezzlement or conversion. According to Defendants, the government, by referencing the Plan Asset Regulation, misled the jury into concluding otherwise. In support of their argument, Defendants ask us to consider the holdings of *United States v. Christo*, 614 F.2d 486 (5th Cir. 1980), and *United States v. Wolf*, 820 F.2d 1499 (9th Cir. 1987).

Although both *Christo* and *Wolf* address the dangers of "bootstrapping" a civil violation into a criminal one, neither case concerns § 664 crimes, nor do their holdings apply here. Both *Christo* and *Wolf* concerned prosecutions against bank executives for misapplication of bank funds, in violation of 18 U.S.C. § 656. *Wolf*, 820 F.2d at 1501; *Christo*, 614 F.2d at 489.

In *Christo*, the misapplication charge was based on a bank officer's repeatedly overdrawing his checking account. At the time, 12 U.S.C. § 375a prohibited a bank from extending a loan of more than $5,000 to one of its officers. *Christo*, 614 F.2d at 488 n.2, 490. The trial court quoted § 375a to the jury and further instructed the jury that it could consider violations of § 375a in connection with the criminal misapplication charges. *Id.* at 491. The Fifth Circuit reversed the defendant's misapplication conviction, observing:

> A conviction, resulting from the government's attempt to bootstrap a series of checking account

overdrafts, a civil regulatory violation, into an equal amount of misapplication felonies, cannot be allowed to stand. The government's evidence and argument concerning violations of § 375a impermissibly infected the very purpose for which the trial was being conducted . . . .

*Id.* at 492.

In *Wolf*, we relied on *Christo* to reverse convictions against a bank executive for misapplying bank funds and making false entries in a bank record. The executive had, among other acts, failed to disclose required information about the beneficiaries of his bank loans. *Wolf*, 820 F.2d at 1503. We faulted the government for basing its misapplication charges on a civil banking regulation that imposes a duty on bank employees to inform the bank's board of directors about the purpose of a loan. During Wolf's trial, the government's expert witness testified that the defendant's failure to disclose he was a beneficiary of some of the loans he disbursed violated Federal Reserve Regulation O (12 C.F.R. § 215). We held that the references to the Regulation were impermissible:

Unlike references to [other civil violations which occurred during the trial], the references to Regulation O cannot be dismissed as being simply background information. The references were a key part of the government's case on the misapplication and false entry counts. . . .

To supply the missing element of the false entry and misapplication charges, the government turned to Regulation O. Through its expert witness the government established that Regulation O imposed a duty on [the defendant] to inform the bank's directors that he had an interest in the loans . . . . *In sum, the government used Regulation O to supply a cru-*

*cial element of the misapplication and false entry charges.*

*Id.* at 1505 (emphasis added). Thus, under the logic of *Christo* and *Wolf*, it is impermissible to use the violation of a civil statute to *ipso facto* "supply a crucial element" of a criminal offense.

**[5]** Contrary to *Christo* and *Wolf*, the Plan Asset Regulation played an inconsequential or, more likely, no role in Defendants' convictions. Importantly, the Plan Asset Regulation does not create a reporting or other affirmative obligation on an employer nor does it prohibit certain behaviors under threat of civil sanction; rather, the regulation simply defines "plan asset": "the assets of the plan *include* amounts . . . that a participant or beneficiary pays to an employer." 29 C.F.R. § 2510.3-102(a)(1) (emphasis added). While one could selectively excerpt and rewrite portions of the regulation to create the appearance that it requires employers to remit their elective deferrals, the regulation does not create any such obligation. Indeed, the obligation not to use other people's money for purposes they have not authorized is traceable more fairly to antiquity than to the Plan Asset Regulation. Thus, contrary to the facts in *Wolf*, none of the elements of Counts 17 or 18 was established at trial, or could be established, by bootstrapping a violation of the regulation. Unlike in *Christo*, the regulation did not mislead the jury in its deliberations, as it was not even a factor for the jurors' consideration.

**[6]** The government did not contend that it was Defendants' failure to remit deferrals within fifteen days that constituted their crime. Rather, it was the fact that employee contributions were *never remitted* from January 1, 2002, until the DOL became involved, but were, instead, used to pay business expenses, as recounted by Brad Sommerfeld and others, that formed the factual and legal basis for the government's case. Conversion is a simple offense that "encompasses the use of property, placed in one's custody for

a limited purpose, in an unauthorized manner or to an unauthorized extent." *Andreen*, 628 F.2d at 1241. When Defendants commingled their employees' contributions with the Company's assets to prop up their failing business, they intentionally used their employee's assets for an unauthorized purpose. Moreover, they sent Participants account statements showing 401(k) balances which were, in fact, non-existent. Defendants' acts were "substantially inconsistent with the fiduciary purposes and objectives of the union funds or pension plan, as set forth by statutes, bylaws, charters, or trust documents which govern uses of the funds in question." *Id.* As fiduciaries of the money given to them by their employees, Defendants were entrusted with custody of their employees' money *for the sole purpose* of remitting it to the 401(k) Plan; the Defendants' decision to deviate, be it to bet on horse races or pay other bills, is the wilful criminal misappropriation punished by § 664.

**[7]** Finally, Defendants' argument regarding the absence of intent is undercut by the evidence that both Defendants were alerted repeatedly about their obligation to remit the deferrals. Moreover, the government showed that Defendants hid their actions from employees by, for instance, withholding Statements of Net Assets in yearly investor reports.

**[8]** Accordingly, there was sufficient evidence to support Defendants' convictions on Counts 17 and 18.

## II. False or Misleading Statements in a Required ERISA Document

Defendants also challenge their convictions under 18 U.S.C. § 1027 for Making False or Misleading Statements in an ERISA Benefit Plan Document that Federal Law Requires to be Kept (Count 21). Count 21 concerned false statements in the 2001 Valuation Reports. Specifically, the government showed that the Valuation Reports, under the heading "Additions During Year," indicated that both employee deferrals

and employer contributions had been made to the Participants' accounts. According to the government's expert witness, these reports were not accurate "[b]ecause these valuation reports show that . . . money had been placed into the trust. It shows that the contributions . . . had been placed into the trust and into investments so those monies can grow, which is in fact not the case."

Defendants argue that this misstatement in the Valuation Reports is not material and, nevertheless, the Valuation Reports were not "required" under the ERISA. Because Defendants raised these arguments to the district court, our review is *de novo*. *See United States v. Sarault*, 840 F.2d 1479, 1482 (9th Cir. 1988).

**[9]** We have held that § 1027 prohibits: (1) "*any* knowingly made false statements or representations of fact, [and] *certain* knowingly concealed, covered-up, or undisclosed facts"; (2) "in a document required by ERISA" to be either published by an employee welfare benefit plan or employee pension benefit plan, kept as part of the records of such a plan, or certified to the administrator of a plan. *Sarault*, 840 F.2d at 1482.

**[10]** Contrary to Defendants' contention, materiality is not a prerequisite for, or an element of, a false statement conviction. *See* 18 U.S.C. § 1027 ("Whoever . . . makes *any* false statement or representation of fact" (emphasis added)); *Sarault*, 840 F.2d at 1485 (explaining that Section 1027 prohibits "*any* knowingly made false statements or representations of fact"); *see also United States v. Nolan*, 136 F.3d 265, 271 (2d Cir. 1998) ("Materiality is not an element of a § 1027 violation."). Even if it were an element of the offense, the Valuation Reports statement that money had been added during the Plan Year, when it in fact it had been used by the Company under Defendants' direction, was undoubtedly material information that Participants would have desired to know. For instance, had an employee attempted to cash out

his 401(k) account at the end of 2001, he would have received far less than what was indicated in the Valuation Reports received from Defendants.

**[11]** Turning to the central question of whether the Valuation Reports were required by the ERISA, we begin by examining the Act's record-retention requirements:

> Every person . . . shall maintain records on the matters of which disclosure is required which will provide in sufficient detail the necessary basic information and data from which the documents thus required may be verified, explained, or clarified, and checked for accuracy and completeness, and shall include vouchers, worksheets, receipts, and applicable resolutions . . . .

29 U.S.C. § 1027. In *Sarault*, we cast a broad net concerning what is "required" by this statute. There, we reviewed the conviction of an attorney who made false representations about the solvency of an insurance company in a letter he sent to fund trustees who were seeking insurance coverage. 840 F.2d at 1481-82. The letter represented that the insurance company was secured by $20 million in "reserves," which were actually fraudulent certificates of deposit. *Id.* at 1481. Following his conviction for making a false statement under § 1027, the defendant argued that only "*financial* records such as receipts and premium statements" were required by the ERISA. *Id.* at 1483. Drawing from a predecessor statute to the ERISA, we observed that Congress intended for "a broad range of documentation [to] be maintained under 29 U.S.C. § 1027." *Id.* at 1484. This range included the attorney's letter because the trustees used it to complete other forms required by the ERISA, including IRS Form 5500. *See* 29 U.S.C. § 1024(a)(2)(A); *United States v. Harris*, 185 F.3d 999, 1003-04 (9th Cir. 1999). Thus, it was undoubtedly a document that provided " 'in sufficient detail the necessary basic information' " to allow another ERISA form to be "verif[ied],

explain[ed], clarif[ied], and check[ed] for accuracy and completeness." *Id.* at 1483-84 (quoting 29 U.S.C. § 1027).

**[12]** Like the letter in *Sarault*, the Valuation Reports could be used, and indeed were used, by Defendants to complete the annual Form 5500. As noted *supra*, Form 5500 asks whether the company transmitted all Participant deferrals to the trust account. Answering this question required aggregating each Participant's contributions, as memorialized in the Valuation Reports, and then comparing that amount to the deposits to the Plan's brokerage account. Indeed, it was precisely this comparison that alerted Brad Sommerfeld that certain monies were not being remitted. Although Lunde Electric was not obligated to provide the Valuation Reports to investors unless demanded, Sommerfeld still completed them, used them to prepare the Form 5500, and then mailed them to Participants. The evidence showed that neither Defendant was ignorant of the misstatements in these reports. Raymond, as Trustee, signed these reports before they were sent to Participants. *See Wiseman*, 274 F.3d at 1243 ("Key evidence of [the defendant's] involvement in the embezzlement is his endorsement . . . of the checks drawn from the benefit plan accounts . . . ."). Likewise, Sigmund was present at the various times when attorney Braley and others told Defendants to deposit the deferrals and, according to Lunde Electric's several accountants, Sigmund was intimately involved in the Company's decisions about which bills should be paid with its dwindling cash revenues.

**[13]** Defendants' post-hoc rationalizations—in particular that, because Participants were ultimately repaid, these misstatements should be excused—ignores the language of § 1027. As we observed in *Harris*, "[a]ll a person has to do in order to comply [with § 1027] is fill out truthfully the [Form 5500]." 185 F.3d at 1004. Defendants would have us adopt a holding that undermines a clear purpose of the ERISA, which, as we detailed in *Sarault,* "was the need to have more information available to plan beneficiaries so they

can enforce their own rights." 840 F.2d at 1484. While Defendants, upon the DOL's launching of its investigation, may have experienced a change of heart and repaid the Plan Account, their initial decision to mislead their own employees about the solvency of their retirement plans by filing false account statements and false Form 5500s are the behaviors targeted by § 1027. Ultimately, the ERISA's goals of honest disclosure and investor protection would be greatly undermined if Defendants escaped liability for providing patently false account statements to Plan Participants.

**[14]** Accordingly, we hold there was sufficient evidence to support Defendants' convictions on Count 21.

## CONCLUSION

For the foregoing reasons, Defendants' convictions and sentences are AFFIRMED.